**G. PROPERTY MANAGEMENT, LTD.;
MonteSan Holdings, Inc.; and
Gustavo Garcia, Appellants,**

v.

**MULTIVEST FINANCIAL SERVICES
OF TEXAS, INC.; Victor Andonie;
Orovest Investments, Inc.; and Commonwealth Land Title Service of San
Antonio, Inc., Appellees.**

No. 04–05–00041–CV.

Court of Appeals of Texas,
San Antonio.

Nov. 8, 2006.

38

Diana M. Geis, Douglas W. Sanders, Joe R. Hinojosa, Oppenheimer Blend Harrison & Tate, Inc., Ellen B. Mitchell, Cox Smith Matthews Incorporated, San Antonio, for Appellants.

Dan Colleluori, Lance V. Clack, Mark T. Davenport, Figari Davenport & Graves, Dallas, Frank Z. Ruttenberg, Bracewell & Patterson, L.L.P., Louis A. LeLaurin, III, LeLaurin & Kessler, L.L.P., Michael J. Murray, Rebecca S. Smith, Sharon E. Callaway, Crofts & Callaway, P.C., Richard G. Jenkins, San Antonio, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

The underlying litigation involves numerous parties, claims, and counter-claims. Common to many of the claims discussed in this appeal is the assertion that one of the parties, Gustavo Garcia, was dishonest about how he funded his share of a partnership's purchase of a commercial building, and that he and others concealed the deception. We affirm in part and reverse and render in part.

## BACKGROUND

On June 7, 1993, Garcia (as purchaser) and A.S., Inc.[1] (as seller) entered into a purchase option contract to buy the Texas Bank North Building ("the TBN building") for $9.5 million. Garcia agreed to pay A.S., Inc. $60,000 as an option payment and $140,000 in earnest money. The purchase option contract also required Garcia to pay an additional $940,000 in earnest money, upon expiration of a "review period." On June 7, Garcia executed a note in the amount of $60,000 payable to A.S., Inc.

In July 1993, Garcia approached Multi-Vest Financial Services of Texas, Inc. ("MultiVest") about investing in the TBN building. On September 15, 1993, Garcia executed a second note in the amount of $940,000 payable to A.S., Inc. On this same date, A.S., Inc. (as seller), Garcia (as purchaser), and MultiVest (as assignee) executed an agreement, which amended the June 7 purchase option contract and under which Garcia agreed to increase the earnest money deposit by an additional $110,000 and to assign fifty percent of his right, title, and interest in the purchase option contract to MultiVest. On September 30, 1993, A.S., Inc. and Garcia executed an amended promissory note, extending the maturity date of the $940,000 note.

On December 15, 1993, MultiVest, G. Property Management, Ltd. ("GPM"), MonteSan Holdings, Ltd. ("MonteSan Holdings"), and MultiVest Properties, Inc. ("MultiVest Properties") signed an Agreement of Limited Partnership, forming MonteSan, Ltd. for the purpose of purchasing, owning, managing, and holding the TBN building. Garcia is a principal in GPM and MonteSan Holdings. Victor Andonie is a principal in MultiVest and

---

1. A.S., Inc. was not a party to the underlying litigation.

Orovest Investments, Inc. ("Orovest"). Orovest later succeeded to MultiVest Properties. GPM, MonteSan Holdings, and Garcia are hereinafter referred to as the Garcia Group. MultiVest, Orovest, and Andonie are hereinafter referred to as the MultiVest Group.

Under a separate Management Agreement between MonteSan, Ltd. and GPM, GPM agreed to act as manager of the building. The limited partnership agreement called for initial capital contributions to be "valued" as follows: (1) GPM $36,000; (2) MultiVest $36,000; (3) MonteSan Holdings $1.764 million; and (4) MultiVest Properties $1.764 million.[2] An individual capital account was established for each partner and each account was to be credited with the amount of each partner's capital contribution "from time to time." "Capital Account" was defined to include, in part, "the amount of all capital contributions of such Partner to the Limited Partnership (valuing all capital contributions at fair market value)...."

The MultiVest Group made its capital contribution of $1.8 million in the form of cash payments toward the purchase price of the TBN building. The Garcia Group, on the other hand, made only part of its contribution in the form of cash payments totaling $800,000. It made the balance of its contribution in the form of two notes signed by Garcia, payable to A.S., Inc., in the amounts of $60,000 and $940,000.

On January 14, 1994, the sale of the TBN building by A.S., Inc. to MonteSan, Ltd. closed at Commonwealth Land Title Service of San Antonio ("Commonwealth"). The purchase money contract called for

payment by "certified or cashier's check or such other means of funding acceptable to Seller, equal to the purchase price, less credits and allowances due Purchaser under this Contract...." Andonie testified he understood this to mean that payment could be in the form of cash or non-cash.

On January 27, 1994, and without Andonie's knowledge, A.S., Inc. and Garcia entered into a Settlement and Release Agreement, whereby A.S., Inc. agreed to accept from Garcia $505,000 in full payment of the amounts owed by Garcia to A.S., Inc. The $505,000 payment was comprised of payments of $60,000 and $320,000, plus an additional $125,000 as payment for shares of Montesan Overseas Investments, Inc.

The underlying litigation commenced when GPM filed a declaratory judgment action against MultiVest, seeking a declaration that it had not breached its duties to MonteSan, Ltd. and that MultiVest could not terminate MonteSan, Ltd.'s management agreement without GPM's consent, and it owed no monies to MultiVest. Garcia intervened and joined GPM. MultiVest counter-sued, and Orovest intervened, in its own right and in the right of MonteSan, Ltd., against GPM and MonteSan Holdings. Andonie intervened and joined MultiVest and Orovest. Eventually, the litigation devolved into claims and defenses by the Garcia Group against the MultiVest Group, the MultiVest Group against the Garcia Group, and the MultiVest Group against Richard Jenkins and Commonwealth. The claims revolved around disputes over the purchase of the TBN building.[3] Following a bench trial, the court

2. The limited partnership agreement defined the Garcia Group as GPM and MonteSan Holdings, and the MultiVest Group as MultiVest and MultiVest Properties. Therefore, each group was required to make an initial capital contribution valued at $1.8 million.

3. Andonie also asserted claims arising from the payment of a commission to Garcia from the sale of a house on Ryoak Street ("the Ryoak house"). The trial court rendered judgment against Garcia and Commonwealth, awarding Andonie $16,000 in damages and

entered a Second Amended Judgment, in which the court terminated the management agreement; awarded damages of $70,745 to the MultiVest Group; awarded attorney's fees to the MultiVest Group; taxed costs against the Garcia Group; and denied all other relief requested. The Garcia Group, the MultiVest Group, and Commonwealth have appealed the judgment.

## MULTIVEST, OROVEST, AND ANDONIE'S APPEAL REGARDING THE FUNDING OF THE PURCHASE OF THE TEXAS BANK NORTH BUILDING

The MultiVest Group alleged below that Garcia and the Garcia Group engaged in a scheme to obtain substantial benefits through self-dealing in the transaction involving the purchase of the TBN building and concealed that scheme from MultiVest. The MultiVest Group contends it was unable to discover the scheme because of Garcia's, Jenkins's, and Commonwealth's non-disclosures and misrepresentations that concealed breaches of fiduciary duties.

The MultiVest Group sued Garcia for breach of fiduciary duties owed by Garcia to the MultiVest Group, and for fraud and fraudulent inducement. The MultiVest Group sued Jenkins and Commonwealth for breach of fiduciary duties, concealment, and aiding and abetting and conspiracy with the Garcia Group in its breaches of fiduciary duty and fraud. In addition, the MultiVest Group also sued Jenkins for fraud, fraud in the inducement, negligence, gross negligence, and negligence per se. Finally, the MultiVest Group also sued Commonwealth for misrepresentations and

violation of Texas Insurance Code Title 9. Among the various remedies sought by the MultiVest Group was its request that the management agreement be terminated.[4] The trial court awarded $70,745 to the MultiVest Group, but denied all other relief requested by the MultiVest Group. The trial court also terminated the management agreement between MonteSan, Ltd. and GPM. The MultiVest Group cross-appeals the adverse findings.

### A. The MultiVest Group's Claims Against Commonwealth

The MultiVest Group sued Commonwealth on March 16, 2003. All of its claims are based on Commonwealth's alleged misconduct as escrow agent and title insurer for the purchase of the TBN building. The MultiVest Group argued that because Commonwealth acted as escrow agent for the TBN building closing, Commonwealth owed a fiduciary duty to all parties to the closing, and that it breached its fiduciary duty by (1) failing to disclose that Garcia underfunded his contribution to the purchase of the building, and (2) misrepresenting that it was holding $140,000 in escrow funds provided by A.S., Inc., when, in fact, A.S., Inc. paid no money into escrow. According to the MultiVest Group, full disclosure of this information "could have caused the transaction to terminate before closing." Before trial, Commonwealth filed a motion for summary judgment on its affirmative defense of limitations. Commonwealth asserted that any cause of action against it accrued no later than March 23, 1994, when the MultiVest Group conducted a post-closing

---

$16,000 in attorney's fees. However, on appeal, Andonie conceded he had no standing to assert these claims. Accordingly, we do not address the Garcia Group's issues relating to the Ryoak house in this opinion.

4. Later, the MultiVest Group added a variety of other claims, including violations of the Uniform Partnership Act, the Texas Revised Partnership Act, and the Texas Real Estate License Act.

investigation into Garcia's funding of his contribution to the purchase of the TBN building. Therefore, Commonwealth argued that the MultiVest Group's 2003 lawsuit against it was barred by limitations.

In its response to Commonwealth's motion for summary judgment, the MultiVest Group argued that the degree of diligence required of an injured party to determine whether an injury has occurred depends on whether the transaction between the parties is arms-length or involves a fiduciary relationship. According to the MultiVest Group, Commonwealth owed a fiduciary duty in its capacity as escrow agent to fully disclose all information. Also, the MultiVest Group asserted that once Commonwealth disclosed partial information, it was under a duty to disclose all information. In support of this fraudulent concealment counter-defense, the MultiVest Group alleged that, from 1994 to 2001, it believed Commonwealth had made a complete disclosure in 1994. However, the MultiVest Group contends the undisclosed facts that "could have caused the transaction to terminate before closing," were not discovered until litigation commenced in 2001. On appeal, the MultiVest Group contends the trial court erred in rendering summary judgment in favor of Commonwealth because genuine issues of material fact exist as to when MultiVest knew or should have known about Commonwealth's breach and misrepresentations.

### 1. Standard of Review

 The statute of limitations on the MultiVest Group's conspiracy claims is two years and the statute of limitations on its remaining claims is four years. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 16.003, 16.004, 16.051 (Vernon 1997 and 2002); *Connell v. Connell,* 889 S.W.2d 534, 541 (Tex.App.-San Antonio 1994, writ denied) (as to conspiracy, the two year statute of limitations applies). However, when a de-

fendant fraudulently conceals facts that form the basis of the plaintiff's claim, limitations do not begin to run until the claimant, using reasonable diligence discovered or should have discovered the injury. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,* 988 S.W.2d 746, 750 (Tex.1999). A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense. *Id.* at 748. The defendant must (1) conclusively prove when the cause of action accrued, and (2) prove as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered or, in the exercise of reasonable diligence, should have discovered the nature of its injury. *Id.* If the movant establishes that the statute of limitations bars the action, the respondent must then produce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *Id.*

### 2. Statute of limitations

 The MultiVest Group suspected the Garcia Group of deception shortly after the January 1994 closing on the sale of the TBN building. Apparently, in March 1994, William Bock, a CPA who was the president of MultiVest, received three different closing statements on the sale. The first closing statement reflected that the Garcia Group made the same contribution as the MultiVest Group. The second closing statement reflected that "deposits by buyer" had been reduced from $310,000 to $255,000. The third closing statement indicated Commonwealth received $1,600,000 from the MultiVest Group, but only $652,-616,45 from the Garcia Group. In the midst of receiving these closing statements, Bock and Bill Waite, a MultiVest vice president, decided to meet with Garcia and Jim Scecina, the Commonwealth escrow officer who closed the transaction, to conduct a post-closing investigation. In

his deposition, Bock stated that concerns arose because "we couldn't see ... the million dollars on [Garcia's] side for his contribution, and ... other expenses and so forth." Bock had "numerous issues" relating to the closing and acquisition of the TBN building and "concerns" about the closing statements, specifically prorated income and expense items and earnest money and option money payments.

On March 14, 1994, Bock faxed a letter to Garcia stating his concerns and that MultiVest wanted to audit "all of the cash flowing into, and out of, the escrow accounts." In the letter, Bock said that he asked Garcia, "with the aid of Commonwealth and [Garcia's] staff," to provide him with an accounting of everything paid into the Commonwealth escrow account and disbursements. Bock also asked for documentary evidence that the payments were made. In the letter, Bock stated "things are not flowing smoothly where they should be, and we need to establish a comfort zone that substantial errors have not been made."

Also on March 14, Bock faxed a letter to Scecina at Commonwealth. In this letter, Bock stated his concerns "with some of the numbers," and asked for Scecina's assistance and comments on a variety of issues, such as deposits shown on the closing statements, change in the dollar amounts, and whether the seller was actually paid $9,423,638.48. Shortly thereafter, Bock also asked Scecina about A.S., Inc.'s side of the escrow, and for substantiation received by Scecina to support the earnest money paid by Garcia on the closing. In his deposition, Bock said Scecina provided him with the requested information. Bock admitted that Scecina did not conceal the fact that Garcia acted on behalf of A.S., Inc. at the closing. When asked if he took the "position today that Mr. Scecina misrepresented anything to you" in 1994, Bock responded that he did not take that position. Bock said what he knew in 1994 "is the same as [he] know[s] now."

Scecina allowed Bock and Waite to examine the escrow files, following which, both Bock and Waite memorialized their investigation in writing. One of the documents that Scecina provided to Bock on March 21, 1994, was a copy of a January 13, 1994 letter from A.S., Inc. to Commonwealth, in which A.S., Inc. acknowledged receiving from Garcia the $60,000 note and the $940,000 note. In his affidavit, Bock stated this copy did not contain a final paragraph that had, apparently, been deleted prior to being sent to him. Bock alleged the paragraph had been "whited out."

Bock wrote to Andonie on March 25, 1994, attaching his and Waite's memorandums. In his memorandum, Bock characterized Scecina's "attitude as wanting to make amends for the sloppy handling of the escrow account, which included numerous breaches of acceptable business practice for title companies." Bock considered the most significant information he received from Scecina to be the disbursement list for the escrow that showed Garcia enterprises and two other entities split a $255,000 commission on the rollover sale to MonteSan, Ltd., with Garcia receiving one-half of the commission. According to Bock's 1994 memorandum and letter to Andonie, this "discovery essentially traps Garcia in a lie, for during our due diligence on the property and several times thereafter he was asked directly to disclose any related interests that he had in the deal and to disclose any related parties." Bock noted that "this latest revelation raises strong issues about Garcia's honesty and ability to act as General Partner." Nevertheless, Bock stated "the escrow account is okay within a few thousand dollars, which will be corrected shortly." Bock concluded

in the 1994 memorandum that there was no reason to sue Commonwealth.

In November 2001, Commonwealth allowed Andonie to review its files concerning all transactions involving the sale of the TBN building. In his affidavit, Andonie stated that the file contained several documents that had not been previously disclosed by the Garcia Group, one of which was the original January 13, 1994 letter. The original copy shows the following paragraph that had been "whited out": "In addition, Mr. Garcia has also paid an additional $84,535.00 towards the Purchase Price outside of closing. Please note these payments on your settlement statements at closing." In support of its fraudulent concealment counter-defense, the MultiVest Group also submitted other evidence of Commonwealth's alleged incomplete disclosures, including 1993 correspondence indicating Garcia's interest in purchasing the building for $7.5 million and, later, for $8.75 million. The MultiVest Group asserts its evidence is sufficient to raise a fact issue on when it knew, or reasonably should have discovered, its injury. The MultiVest Group also asserts that the 2001 revelations conclusively establish that Commonwealth fraudulently concealed facts that would form the basis of MultiVest's claims. We disagree.

The MultiVest Group conducted an investigation shortly after the closing on the sale of the TBN building in 1994. Its president and CPA discovered that Commonwealth mishandled the escrow account and that Garcia did not pay, in cash, the full amount of his $1.8 million contribution to the purchase. Revelations, as early as 1994, that Garcia may have lied about the funding and that Commonwealth was aware of Garcia's actions should have caused the MultiVest Group to conduct a more diligent investigation into why its escrow agent did not reveal what it knew about Garcia's actions and whether Commonwealth participated in the deception allegedly perpetrated by Garcia. *See KPMG Peat Marwick*, 988 S.W.2d at 749. Instead, the MultiVest Group waited almost nine years after its initial investigation in 1994 and two years after it received additional information in 2001 to file suit against Commonwealth. Thus, we conclude the trial court properly rendered summary judgment in favor of Commonwealth.

## B. The MultiVest Group's Claims Against The Garcia Group

The MultiVest Group sued Garcia for breach of fiduciary duty, alleging Garcia failed to disclose that he had not made, and did not intend to make, his full contribution toward the purchase of the TBN building. The MultiVest Group complains that Garcia breached his fiduciary duty by representing that he had made capital contributions by paying the notes he executed for the purpose of purchasing the TBN building, when the evidence shows that he did not. According to the MultiVest Group, Garcia had a fiduciary duty to disclose his failure to fully fund his share of the purchase. The MultiVest Group also sued Garcia for fraud and fraudulent inducement, alleging Garcia fraudulently misrepresented his intent to make the promised contribution and those misrepresentations, both before and after the formation of MonteSan, Ltd. and the purchase of the TBN building, induced MultiVest's participation in both the partnership and the purchase. Common to all claims is the MultiVest Group's allegation that Garcia allegedly lied about his payment of the notes used to fund his contribution.

The MultiVest Group brought suit against the Garcia Group on its breach of fiduciary duty claim and fraud and fraudulent concealment claims in 2002. At trial,

the Garcia Group asserted the MultiVest Group's claims were barred by the statute of limitation because it knew as early as 1994 about any alleged breach or misrepresentation, and limitations ran four years later in 1998. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4), (5) (Vernon 2002). The MultiVest Group does not dispute that any injury caused by Garcia occurred in 1994; instead, it argues that the Garcia Group's affirmative defense of limitations is defeated by Garcia's fraudulent concealment of facts giving rise to its claims.

### 1. Standard of review

■■■ Although the MultiVest Group requested findings of fact and conclusions of law, it did not file a notice of late findings, and the trial court did not enter findings and conclusions. Under these circumstances, findings and conclusions necessary to support the judgment must be implied and the judgment affirmed on any legal theory that finds support in the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002). When, as here, the appellate record includes the clerk's and reporter's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appropriate appellate court. *Id.* Because the trial court here did not file findings or conclusions, on appeal, the MultiVest Group must challenge all possible grounds supporting the judgment in favor of the Garcia Group. *See Larry F. Smith, Inc. v. The Weber Co.*, 110 S.W.3d 611, 614 (Tex.App.-Dallas 2003, pet. denied).

■■■ On appeal, the MultiVest Group asserts the evidence is legally insufficient to support the trial court's implied findings because the evidence conclusively establishes its claims against Garcia. At trial, the MultiVest Group bore the burden of proof at trial on its claims against Garcia.

Where a party bears the burden of proof and the factfinder fails to find for that party, there are two inquiries for a reviewing court in considering the legal sufficiency challenge: first, the record must be examined for evidence that supports the factfinder's failure to find for the party with the burden of proof; and second, if there is no evidence to support the failure to make a finding, then, "the entire record must be examined to see if the contrary proposition is established as a matter of law." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001); *Sterner v. Marathon Oil*, 767 S.W.2d 686, 690 (Tex. 1989). Because the trial court's take-nothing judgment could have rested on the ground that the MultiVest Group's claims against the Garcia Group were barred by limitations and because that issue is dispositive, we address only whether the MultiVest Group conclusively established that its claims were not barred.

### 2. Statute of limitations

The MultiVest Group argues that its duty to undertake an investigation into a possible breach of fiduciary duty or misrepresentation is limited in the context of a partnership because an inquiry to the "highest source" permits reasonable reliance on assurances and "is a sufficient investigation to implicate the protections against limitations." According to the MultiVest Group, Garcia was the "highest source" and it was entitled to rely on his representations. The MultiVest Group contends it was not aware that Garcia misrepresented, did not disclose, or concealed the amount of his cash contribution to the purchase of the TBN building and that Garcia had not paid the notes claimed to have been used to finance his contribution until late 2001 or early 2002; therefore, the limitations period was tolled and its lawsuit was timely-filed on March 15, 2002.

The discovery rule defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex.1996). However, application of the discovery rule is permitted only in "those cases where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Id.; Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997). An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence. *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex.2001). "The requirement of inherent undiscoverability recognizes that the discovery rule exception should be permitted only in circumstances where 'it is difficult for the injured party to learn of the negligent act or omission.'" *Computer Assocs.*, 918 S.W.2d at 456 (quoting *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex.1988)). In the fiduciary context, it may be said that the nature of the injury is presumed to be inherently undiscoverable, although a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs. *Computer Assocs.*, 918 S.W.2d at 456.

Similarly, the doctrine of fraudulent concealment tolls the statute of limitations until the fraud is discovered or could have been discovered with reasonable diligence. *Velsicol Chem.*, 956 S.W.2d at 531. "It is not the rule that a person injured by the fraudulent and false representations of another is held to the exercise of diligence to suspect and discover the falsity of such statements. In the absence of knowledge to the contrary, he would have a right to rely and act upon such statements, and certainly the wrongdoer in such a case cannot be heard to complain that the other should have disbelieved his solemn statements." *Western Cottage Piano & Organ Co. v. Anderson*, 45 Tex.Civ.App. 513, 101 S.W. 1061, 1064 (Tex.Civ.App.-Fort Worth 1907, writ ref'd) (quoted with approval in *Koral Indus., Inc. v. Security–Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex.1990)).

The MultiVest Group alleges it approached Garcia in 1994 and 1995 to inquire about whether Garcia had paid the notes used to finance his contribution, and Garcia unequivocally assured it, first, that the notes would be paid, and, later, that the notes had been paid. However, according to the MultiVest Group, these representations were false when made because the $940,000 note had already been settled and released upon partial payment. The MultiVest Group asserts it was also entitled to rely on 1995 tax returns filed on behalf of MonteSan, Ltd. Garcia was the designated tax partner and he filed the partnership's March 1995 return. The return states the partnership paid $8,393,033 for the TBN building and $1,548,552 for the land. Thus, according to the MultiVest Group, Garcia's representation to the Internal Revenue that MonteSan, Ltd.'s cost basis in the building exceeded $9.5 million corroborated his direct representations concerning the validity of the notes. The MultiVest Group contends it did not become aware until late 2001 that Garcia's "representations may have been untrustworthy."

The relationship between partners is one of a fiduciary nature. *See Johnson v. Buck*, 540 S.W.2d 393, 412 (Tex.Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.). However, the existence of a fiduciary relationship does not change the rule that diligence in discovering the breach of fiduciary duty or fraud is required. *See Courseview, Inc. v. Phillips*

*Petroleum Co.,* 158 Tex. 397, 312 S.W.2d 197, 205 (1957). Instead, the existence of a fiduciary relationship affects only the application of the rule. *Id.* Therefore, the existence of a fiduciary relationship is one of the circumstances to be considered in determining whether a breach of a duty or fraud might have been discovered by the exercise of reasonable diligence. *Id.* In other words, "one in a relationship of trust and confidence is [not] always justified as a matter of law in neglecting every precaution until something occurs to arouse his suspicions." *Id.* Each case must rest on its own facts. *Id.*

■ Here, the record supports the trial court's implied finding that the MultiVest Group either knew or, through the exercise of reasonable diligence, should have discovered, the nature of its injury as early as either 1994 or 1995. In March 1994, the MultiVest Group first became aware of a discrepancy in the partnership capital accounts. On March 23, 1994, Bock and Waite met with Garcia about the TBN building transaction. In Bock's and Waite's memorandum, prepared after reviewing all the closing documents from Commonwealth, they stated "they were looking for documentation of all Garcia's contributions to the escrow, since many payments to the account were not readily traceable." Part of the documentation they reviewed included copies of cashier's checks and the two notes. In the memorandum, Bock stated: "The presence of the notes had been previously suspected, but not confirmed. In simple terms Garcia had put roughly one million dollars less than ourselves into the escrow." Bock also stated he told Garcia "he was being 'graded' in our early relationship and that he had to earn our trust by performing in an exemplary fashion, which he had not done."

Based on Bock's questions regarding Garcia's honesty, on October 4, 1994, Bock sent Garcia a letter in which Bock stated, "[u]pon further consideration, no remedy, even those previously discussed, is adequate to erase your breach of our trust." On October 14, 1994, Bock sent Garcia another letter, this time asking Garcia to resign as manager of the TBN building. The parties then engaged in discussions to buy-out the Garcia Group; however, soon after the discussions began, the Mexican peso devalued resulting in a cash-flow problem for the MultiVest Group. At this point the parties recognized that the better option was for them to remain partners.

In May 1995, Andonie contemplated selling his interest in MonteSan, Ltd. to another individual. Garcia testified that he told Andonie that he (Garcia) did not want the "issue" of how he purchased the TBN building to arise at a later date. Therefore, Garcia said he asked Andonie to sign a document acknowledging how Garcia purchased the TBN building. In an undated letter to Garcia, Andonie stated the following:

> This letter is to inform you that I am considering assigning my ownership in Montesan to Mr. Alfonso Romo or one of his entities and to ratify that I have full knowledge of the way you structured the purchase and payment of your share in Montesan, including your source of funds and have no claim about it.

Andonie testified Garcia told him in February 1995 that he had paid the two notes in cash. He also testified that, when he wrote the letter, Garcia again reaffirmed that he had paid the notes in cash. Garcia, on the other hand, testified that from March 1994 until the date of the lawsuit in late 2001 neither Andonie nor anyone at MultiVest approached him to ask if the notes had been satisfied.

Although Andonie and Garcia's testimony conflict, in a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Shull v. United Parcel Serv.*, 4 S.W.3d 46, 51 (Tex.App.-San Antonio 1999, pet. denied). The trial court has the right to accept or reject any part or all of a witness's testimony. *See Hood v. Texas Indem. Ins. Co.*, 146 Tex. 522, 209 S.W.2d 345, 346 (1948). The court may believe one witness and disbelieve others and may resolve inconsistencies in any witness's testimony. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). Because it was within the trial court's province to weigh the credibility of the witnesses and the weight to be given their testimony, the evidence is legally sufficient to support the trial court's implied finding that the MultiVest Group possessed "knowledge of facts sufficient to excite inquiry" as early as 1994 or as late as 1995. *See Courseview*, 312 S.W.2d at 205. This is not a case in which the injured party may be excused from exercising reasonable diligence based on the honesty and integrity of the other party. *Id.* Although a fiduciary relationship existed between Garcia and Andonie, it is clear from this record that an atmosphere of mistrust existed from almost the inception of the partnership. Under these circumstances, the MultiVest Group was not "justified as a matter of law in neglecting every precaution until something occur[red] to arouse [its] suspicions." *Id.* Also, under these circumstances, the true facts regarding Garcia's payment of the notes would ultimately have been brought to light by the exercise of due diligence. Because the MultiVest Group did not conclusively establish that it could not have known or, through the exercise of reasonable diligence, would not have known about its injury as early as 1994 or as late as 1995, its suit against the Garcia Group was barred by limitations.

## C. The MultiVest Group's Claims Against Richard Jenkins

The MultiVest Group contends that, in addition to being Garcia's attorney, Jenkins was also MonteSan, Ltd.'s legal counsel and, while serving as MonteSan, Ltd.'s counsel, he did not disclose Garcia's failure to contribute $1 million to the partnership. At trial, Jenkins admitted he did not tell anyone at MonteSan, Ltd. or MultiVest about his discussions with Garcia regarding forgiveness of the two promissory notes.

### 1. Standard of Review

We apply the same standard of review as above, wherein the trial court has not filed findings of fact and conclusions of law. Therefore, the findings and conclusions necessary to support the judgment must be implied and the judgment affirmed on any legal theory that finds support in the evidence. *BMC Software*, 83 S.W.3d at 795. Because the trial court here did not file findings or conclusions, on appeal, the MultiVest Group must challenge all possible grounds supporting the judgment in favor of Jenkins. *See Larry F. Smith, Inc.*, 110 S.W.3d at 614. On appeal, the MultiVest Group asserts the evidence is legally insufficient to support the trial court's implied findings because the evidence conclusively establishes its claims against Jenkins. Because the trial court's take-nothing judgment could have rested on the ground that the MultiVest Group's claims against Jenkins were barred by limitations and because that issue is dispositive, we address only whether the MultiVest Group conclusively established that its claims were not barred.

### 2. Statute of limitations

The MultiVest Group brought suit against Jenkins on May 16, 2003. The MultiVest Group argues that Jenkins's

limitations defense is negated "by the principle that the attorney's failure to make full disclosure is tantamount to fraudulent concealment."

Garcia engaged Jenkins to prepare contracts for the purchase of and to obtain financing for the purchase of TBN building. Jenkins drafted the June 7, 1993 purchase option contract between Garcia and A.S., Inc., in which Garcia agreed to purchase the building from A.S., Inc. for $9.5 million. Jenkins stated he was involved in the negotiations with Multi-Vest's attorney regarding the formation of MonteSan, Ltd. At the time of these negotiations, he did not recall MultiVest's attorney, Andonie, or Bock indicating the partnership contributions had to be made in cash. Jenkins participated in the negotiations of the notes payable to A.S., Inc. by Garcia that occurred from June 1993 to March 1994. Finally, following the 1994 investigation by Bock and Waite, Jenkins was asked to draft the buy-out documents. At this time, Jenkins said no one from the MultiVest Group asked him about the notes, how they were paid, or if they were satisfied.

We again conclude that, because it was within the trial court's province to weigh the credibility of the witnesses and the weight to be given their testimony, the evidence is legally sufficient to support the trial court's implied finding that the Multi-Vest Group possessed "knowledge of facts sufficient to excite inquiry" as early as 1994 or as late as 1995. *See Courseview*, 312 S.W.2d at 205. The MultiVest Group's 1994 investigation revealed that Garcia did not pay, in cash, the full amount of his $1.8 million contribution to the purchase of the TBN building. Similar to the MultiVest Group's claims against Commonwealth, the MultiVest Group's concerns over Garcia's honesty as early as 1994, coupled with proof resulting from the investigation that

he had lied about the escrow, in addition to revelations that Commonwealth had mishandled the escrow account, should have caused the MultiVest Group to investigate Jenkins's possible involvement in Garcia's deception. Instead, the MultiVest Group waited almost nine years after its initial investigation in 1994 and two years after it received additional information in 2001 to file suit against Jenkins. Because the MultiVest Group did not conclusively establish that it could not have known or, through the exercise of reasonable diligence, would not have known about its injury as early as 1994 or as late as 1995, its suit against Jenkins was barred by limitations.

## THE GARCIA GROUP'S APPEAL REGARDING AWARD OF FEES AND COSTS TO MULTIVEST AND OROVEST

MultiVest and Orovest sought attorney's fees against the Garcia Group under Texas Civil Practice and Remedies Code sections 37.009 for its declaratory judgment suit and 38.001 for its breach of contract claim, and under the Texas Revised Limited Partnership Act. In its judgment, the trial court decreed that Orovest, on behalf of MonteSan, Ltd. was entitled to terminate the management agreements with GPM "for 'cause'" based upon GPM's violation of the management agreements with MonteSan, Ltd. and the court awarded Orovest, on behalf of MonteSan, Ltd. recovery in the amount of $70,745. The trial court also awarded MultiVest and Orovest attorney's fees in the amount of $400,000 through trial and additional fees upon an appeal. Because the trial court did not state upon which grounds it awarded attorney's fees, on appeal, the Garcia Group challenges the award on various grounds: (1) the fees are unreasonable in view of the small ($70,745) award to the MultiVest Group and because the evidence is factual-

ly insufficient to support an award of $400,000; (2) the fees are not equitable and just; and (3) only Orovest is entitled to fees (if any) and MultiVest is not entitled to any fees.

 We review an award of attorney's fees for an abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998). Whether the fees are reasonable and necessary is reviewed for sufficiency of the evidence. *Id.* Whether the fees are just and equitable is a matter of law. *Id.*

## A. Equitable And Just; Reasonableness Of Fees

"In any [declaratory judgment] proceeding ..., the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (Vernon 1997). The Garcia Group complains that the fees are not equitable and just because the evidence is factually insufficient to support the award and the record reflects that the MultiVest Group "unnecessarily complicated the present litigation and the Garcia Group was relatively far more successful than the MultiVest Group...." According to the Garcia Group, the termination of the management agreements could have been obtained without litigation if MonteSan had exercised the buy-sell provision contained in the partnership agreement.

 "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997); *see also Laredo Indep. School Dist. v. Trevino,* 25 S.W.3d 263, 266 (Tex.App.-San Antonio 2000, pet. denied). There exists a presumption that the usual and customary attorney's fees for a claim of the type described in section 38.001 are reasonable; however, that presumption may be rebutted. TEX. CIV. PRAC. & REM.CODE ANN. § 38.003 (Vernon 1997). The Garcia Group complains that the fees are not "reasonable in the context of this case" and the evidence is factually insufficient to support the award. We disagree.

George Spencer, who is an attorney licensed in Texas since 1977 and employed by the law firm of Clemens & Spencer since 1978, testified on behalf of MultiVest and Orovest. Spencer's qualifications to testify about attorney's fees have not been challenged. He stated that the usual and customary fees for attorneys and legal assistants is, depending upon experience, $150 to $400 per hour, and $75 to $125 per hour, respectively. He said he had reviewed the hourly rates charged by the attorneys, and, in his opinion, the fees were "quite reasonable." In fact, he thought the fees charged "with regard to the senior lawyers ... below what [he] would deem the market rate to be." Spencer said he considered "to varying degrees" the factors listed in *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812 (Tex.1997),[5] as well as the addi-

---

5. In *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812 (Tex.1997), the Supreme Court held that, in awarding attorney's fees, the trial court must take into account various factors such as: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on

tional fact that the relationship of the parties was that of a partnership. Spencer thought reasonable and necessary fees would amount to $1.4 million. Spencer asked the law firms to color code their fee statements in a manner that would segregate fees attributable to issues related to the management agreement, the Ryoak house transaction, and other matters. After reviewing these statements, as well as charts that identified witnesses, Spencer concluded that "management issues were approximately half of the case" and the Ryoak transaction "was a significant part of it."

After reviewing all the information provided by the law firms, Spencer opined that a reasonable fee for the derivative claims brought by Orovest on behalf of MonteSan, Ltd. against GPM would be $550,000, which was an amount greater than that listed by the law firms on their fee statements ($411,289). When asked why his amount was greater, Spencer replied that (1) the hourly rates charged by the senior lawyers had been discounted and "were below reasonable rates that would be appropriate for lawyers of [their] experience and stature" and (2) he thought other billable time that should have been included was not included in the fee statements. As for a reasonable fee for the Texas Real Estate License Act claim brought by Orovest on behalf of MonteSan, Ltd. against GPM, Spencer thought that amount would be $62,621.25. Finally, Spencer thought $550,000 would be a reasonable fee for the Declaratory Judgment Act claim brought by Orovest on behalf of MonteSan, Ltd., a claim Spencer thought to be coextensive with the breach of management issues.

On cross-examination, Spencer could not recall a case in which the trial court awarded attorney's fees in excess of the recovery awarded. However, when again asked whether "in your entire career . . . you have testified that fees ought to exceed the amount of the ultimate recovery . . . .," he responded, "If the management agreement is terminated and if as it has been represented to me, as I heard this afternoon, that that would achieve a savings of between $150,000 and $250,000 a year, I would say that the victory that has been achieved by [MultiVest and Orovest] greatly exceeds any number that I'm talking about."

Based on this record, we conclude the trial court did not abuse its discretion in awarding $400,000 in attorney's fees.

## B. MultiVest's Entitlement To Fees

▇▇ The Garcia Group contends MultiVest is not entitled to attorney's fees because (1) it did not prevail on a breach of contract claim, (2) it did not recover damages for any such claim, and (3) it was not a party to the contracts that formed the basis of the litigation. According to the Garcia Group, only Orovest, on behalf of MonteSan, Ltd., prevailed on the contract claim and recovered damages. Therefore, the Garcia Group contends only Orovest is entitled to recover its fees. This argument appears to ignore the fact that the Garcia Group filed suit first, seeking a declaration "that MultiVest may not terminate MonteSan's management agreement without GPM's consent." The trial court implicitly denied that request when it decreed that Orovest, on behalf of MonteSan, Ltd., was entitled to terminate the management agreements. The Declaratory Judgment Act does not limit an award of attorney's

results obtained or uncertainty of collection before the legal services have been rendered.

*Id.* at 818.

fees only to a prevailing party. *See Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex.1996). Based on this record, we conclude the trial court did not abuse its discretion in awarding attorney's fees to MultiVest.

### C. Costs Assessed Against The Garcia Group

■■■■■■ Finally, the Garcia Group asserts the trial court erred in assessing all costs against it because it was a successful party. However, the trial court ultimately decreed that Orovest was entitled to terminate the management agreements and that the Garcia Group take nothing on its claims against MultiVest, Orovest, and Andonie. We review a trial court's assessment of costs for an abuse of discretion. *Crescendo Inv., Inc. v. Brice*, 61 S.W.3d 465, 480 (Tex.App.-San Antonio 2001, pet. denied). Based on this record, we conclude the trial court did not abuse its discretion in assessing costs against GPM, MonteSan Holdings, and Garcia.

### CONCLUSION

That portion of the judgment awarding Andonie $16,000 in damages and $16,000 in attorney's fees for his claims arising from the Ryoak house purchase is reversed, and judgment is rendered that Andonie take nothing on his claims against Garcia and Commonwealth with regard to those claims. The judgment is affirmed in all other respects.