# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00310-CV

**Roland D. Fortenberry, Jr., a/k/a Dale Fortenberry, Jr. and Kaye Ann Fortenberry, Appellants**

**v.**

**Gerald R. Cavanaugh, Jr. and Dianna Cavanaugh, individually and as Shareholders in the right of Fortune Products, Inc., a Texas Corporation, Appellees**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT NO. 30599, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from a dispute over the control of the management of Fortune Products, Inc., a family-owned business in Marble Falls. Appellants Roland D. Fortenberry a/k/a Dale Fortenberry, Jr., and Kaye Ann Fortenberry appeal the jury's verdict and the district court's judgment in favor of appellees Gerald R. "Jay" Cavanaugh, Jr., and Dianna Cavanaugh.

In five issues, the Fortenberrys contend that (i) the trial court erred by awarding the Cavanaughs attorney's fees and costs; (ii) the evidence is legally or, alternatively, factually insufficient to support the judgment in favor of the Cavanaughs' claim for declaratory judgment and, as a matter of law, the Fortenberrys are entitled to declaratory judgment and attorney's fees; (iii) questions to the jury were erroneous, caused the rendition of an improper verdict, and cannot

provide a basis for the judgment; (iv) the evidence is legally or, alternatively, factually insufficient to support the appointment of a receiver; and (v) the contempt order exceeds the district court's statutory authority. For the reasons that follow, we affirm the district court's judgment.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### *Background of the Company*

Fortune Products, Inc., was created in 1984. It manufactures and sells knife sharpeners. From its inception in 1984 to 2000, Dale Fortenberry, Sr., was the majority shareholder, a director, and held the positions of president and chairman of the board. His wife, Betty Fortenberry, was a director and held the positions of secretary and treasurer. Their two children, Dale Fortenberry, Jr.,[2] and Dianna Cavanaugh, also worked in the business. In 1990, Fortenberry, Sr., and Betty Fortenberry, as directors, promoted Fortenberry to the position of vice president.

Effective January 1, 2000, Gerald R. "Jay" Cavanaugh, their daughter's husband, was hired "in the capacity of Vice President of Finance and Administration . . . in charge of all accounting functions as well as production and plant maintenance." At the same time, Fortenberry's

---

[1] Pending before this Court are the Cavanaughs' motion for leave to file sur-reply brief, motion for leave to file post-argument response to appellants' citation of authority during argument, and motion to strike sections II and IV of appellants' reply brief. We deny the motion to strike, we deny the motion for leave to file sur-reply brief as moot, and we grant the motion for leave to file post-argument response. Also pending before this Court is the Fortenberrys' motion for leave to file post-submission brief and response to motion to strike. We grant the motion for leave.

[2] In this opinion, we refer to appellant Roland D. Fortenberry, Jr., as "Fortenberry," and we refer to his father Dale Fortenberry, Sr., as "Fortenberry, Sr." In addition, we refer to appellant Kaye Ann Fortenberry as "Mrs. Fortenberry."

title changed to Vice President of Sales and Marketing.  Both Fortenberry and Cavanaugh reported to Fortenberry, Sr., and they both had supervisory responsibility of other employees.

In the summer of 2000, Fortenberry, Sr., was diagnosed with cancer.  Although the parties dispute when the decision was made for the two sides of the family to purchase the shares of the company, the record reflects Fortenberry, Sr., sold the company's outstanding shares on August 1, 2000, equally to the Fortenberrys and the Cavanaughs.[3]  Also on August 1, 2000, the shareholders and directors held a special meeting.  Fortenberry, Sr., and Betty Fortenberry resigned as directors and officers of the company, and Fortenberry, Mrs. Fortenberry, Cavanaugh, and Mrs. Cavanaugh were elected directors.  The directors elected Cavanaugh as chairman of the board and vice president, Fortenberry as president, and Mrs. Cavanaugh as the secretary and the treasurer.  The shareholders also amended the shareholders agreement to require the shareholders to elect themselves as the four directors.  Shortly after the sale, Betty Fortenberry died, and Fortenberry, Sr., died in June 2001.

### The Controversy

The shareholders and directors held annual meetings in October 2000, 2001, and 2002, re-electing the same officers and directors. The October 2003 annual meeting, however, ended without the re-election of directors and officers, and the parties have feuded over the day-to-day management of the company since at least that time.

By letter dated June 28, 2004, Fortenberry advised Cavanaugh that he was

_____

[3] After the sale on August 1, 2000, Fortenberry owned 307 shares, Mrs. Fortenberry owned 178 shares, Cavanaugh owned 178 shares, and Mrs. Cavanaugh owned 307 shares.

3

discontinuing Cavanaugh's "participation in the day-to-day operations of the company":

This letter is to inform you of changes I am implementing with respect to the day-to-day operations of the corporation. The morale of the company has suffered as a result of your interaction with the employees. . . . Therefore, in order to protect the company's profitability and to continue to enhance shareholder value, I am exercising my authority to discontinue your participation in the day-to-day operations of the company.

Section 5.09 of Fortune Products Inc.'s bylaws identifies the President as the chief executive officer of the corporation, and gives him the authority to make decisions regarding the general and active management of the corporation's business. The action that I am taking is in no way intended to remove you from your position as Vice President, but to change your duties with respect to day-to-day operations. As you know, your role in the operation of the corporation was always intended to certain financial matters. Your participation in the operations of the company is specifically subject to my authority to delegate those duties to other officers of the corporation as outlined in the bylaws and as deemed in the best interests of the company and its shareholders. Because of the unquestionable downward trend in company morale and productivity, I am now exercising my authority to exclusively oversee the company's day-to-day operations. While I appreciate your previous assistance, you will no longer provide any management or personnel supervision and you will no longer office on the premises of the company.

As I previously noted, this action does not alter your position as Vice President nor is it intended to discontinue your salary; that authority rests solely with the board of directors. This action is taken pursuant to my duty to enhance shareholder value and is specifically authorized by the corporation's bylaws, which grant the President the authority to actively manage the company's daily operations. I trust that you will recognize that I am exercising my authority in the best interests of all of the company's shareholders, including you.

You will be expected to monitor the company's investment accounts as you have historically done, and to provide input on financial statements and transactions as specifically requested by me and/or the Board of Directors. Should you need additional computer equipment to perform these duties from your home, the Company will make available equipment reasonably necessary to performing your duties.

In order to provide further clarity, you are not to direct or supervise the activities or duties of any company employees, nor are you to contact any of the

4

company's salesmen, distributors or customers. Any violation of these instructions will require action, judicial or otherwise, necessary to insure compliance. While you may retain the corporate American Express card, only reasonable and necessary corporate expenses incurred in the performance of these specified duties will be accepted.

***Litigation Commenced***

On June 29, 2004, Fortenberry filed a declaratory judgment action in Travis County against Cavanaugh to determine Fortenberry's authority regarding management of the company, including his authority to prescribe Cavanaugh's duties. Fortenberry obtained a temporary restraining order barring Cavanaugh from his office at the company. The next day, June 30, the Cavanaughs filed suit in Burnet County against Fortenberry and Fortune Products, seeking a declaratory judgment to determine the respective rights of the parties. The Burnet County action also asserted claims for an accounting and the appointment of a receiver, for monetary damages, and for injunctive relief. The Cavanaughs obtained a temporary restraining order against Fortenberry, and, after a hearing in July, a temporary injunction against him.

The temporary injunction against Fortenberry remained in effect pending the trial on the merits. The injunction enjoined Fortenberry from, among other things, entering into any contract or agreement except as authorized by the court or the company's board of directors, making withdrawals from any checking or savings account of Fortune Products except for "reasonable, necessary, ordinary and routine business expenses," incurring any indebtedness in the name of Fortune Products except for "reasonable, necessary, ordinary and routine business expenses," excluding the Cavanaughs from the office or other facilities of Fortune Products, opening or diverting mail addressed to the Cavanaughs, or engaging in any other acts to hinder or prevent the

5

Cavanaughs from exercising their rights and authority or from performing their duties as officers of the company. The Cavanaughs filed numerous motions for contempt alleging continuing violations of the injunction by Fortenberry, and there were numerous contempt hearings during the pendency of the case.

After hearings on various matters in Burnet County, including a motion to appoint a receiver, and an unsuccessful mediation, the district court in November 2004 appointed Burl Harper, who had been the company's accountant since approximately 1997, to serve as a receiver for the company. Fortenberry and Fortune Products appealed the receivership to this Court, and this Court reversed it in June 2005, holding that the "district court abused its discretion in prematurely ordering the appointment of a receiver with sweeping powers." *See Fortenberry v. Cavanaugh*, No. 03-04-00816-CV, 2005 Tex. App. LEXIS 4665, at \*10 (Tex. App.—Austin 2005, no pet.).

The litigation continued with the Travis County case being transferred and consolidated with the Burnet County case in September 2005. In January 2006, the district court ruled on competing motions for partial summary judgment on the parties' respective declaratory claims, granting both motions in part and denying both motions in part. The court granted the Cavanaughs' proposed declaration 2 as to the "inherent" powers of the president and their proposed declarations 5, 8, and 9:

(2) Defendant Fortenberry has no inherent powers by virtue of his office as President to bind Fortune Products, except as to routine matters arising in the ordinary course of business; . . .

(5) Defendant Fortenberry has no power or authority to set, increase, reduce or

6

discontinue the wages or salary of any officer or employee of Fortune Products, except as authorized by the Board of Directors of Fortune Products; . . .

(8) Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as Vice President, is authorized, in the absence or disability of the President, to perform the duties and have the authority and exercise the powers of the President;

(9) Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as Vice President, shall perform such other duties and have such other authority and powers as the Board of Directors of Fortune Products may delegate.

The court granted Fortenberry's proposed declarations that "Fortenberry, as president, has the authority to manage and transact the day-to-day business of Fortune Products, Inc.," and "Fortenberry, as president, has the authority to prescribe the duties of the employees and officers of the company, subject to the limits set forth in this Order." The court denied the parties' other requested declarations. Thereafter, the Cavanaughs amended their pleadings to include a shareholder's derivative action and to name Mrs. Fortenberry as a defendant.

***The Trial***

The jury trial occurred in October 2006. The parties agreed that the pending contempt motion and attorney's fees would be tried to the court, and certain facts were not disputed. It was undisputed that Fortune Products remained a solvent company with significant assets and few liabilities, that the company's bylaws were adopted in 1984 and had not been amended, that the shareholders and board of directors remained deadlocked in the management of the company's affairs, that the Cavanaughs removed Fortenberry as a signatory from the company's operating and investment accounts during the pendency of the case, and that Fortenberry, among other actions, had

7

incurred indebtedness, made payments with company checks, and entered into contracts on behalf of the company without obtaining the Cavanaughs' agreement during the pendency of the case.

The Cavanaughs' theory to the jury was that the agreement between the parties was for the Fortenberrys and the Cavanaughs to manage Fortune Products at the board level with neither side having authority over the other, consistent with the bylaws and the manner in which Fortenberry, Sr., and Betty Fortenberry managed the business when they were officers and directors. In addition to their own testimony, the Cavanaughs' witnesses included Burl Harper, David Scott who was the controller of Fortune Products, James "Jim" Tipton who had a working friendship with Fortenberry, Sr., Donald Stroud whose company had been one of Fortune Products' suppliers for approximately 20 years, Mike Thelen who was a former employee of Fortune Products in inside sales, and their experts, Joseph Picken and Greg Skelton.

Cavanaugh testified that he gave up a successful career to come to work for Fortune Products in January 2000 after ongoing discussions with the family, including with Fortenberry, about what his role would be at the company. He testified that the agreement from the beginning was "50/50 ownership" between the two sides of the family with the directors in "control" of the business. He testified to his duties at the company as vice president and his interactions with Fortenberry through the time of trial. Cavanaugh testified that Fortenberry had prevented him from participating in the business by, among other things, having the locks changed at the office, opening and diverting mail addressed to Cavanaugh, denying Cavanaugh access to the company's computers, and entering into contracts, incurring indebtedness, and making payments without the Cavanaughs' prior knowledge or approval. David Scott testified consistently that Fortenberry had the locks

8

changed at the company, denied Cavanaugh access to the computers, diverted mail, and made payments without his prior knowledge.

Mrs. Cavanaugh testified to her role at the business over the years and how her parents managed the business together. She testified that the agreement between the two sides of the family was for equal ownership and control and that, in the event the two sides were unable to agree, the plan was for Jim Tipton to serve as the "tiebreaker." She testified that her father told them that Fortenberry's title as "president" was "just a title that I promised to him when he was younger. It doesn't mean anything."

The Cavanaughs called other witnesses that testified to the 50/50 arrangement between the families. Mike Thelen testified that he was an employee of Fortune Products from October 2002 to the first part of 2004, that he took direction from both Fortenberry and Cavanaugh, and to his "feeling it was a 50/50 split in the company" between the two sides of the family. Tipton testified to a conversation that he had with Fortenberry, Sr., in the summer of 2000 after Fortenberrry, Sr., was diagnosed with cancer:

> Q.  Well, at some point in the summer of 2000, did you have an occasion to hear from Mr. Fortenberry[, Sr.,] about—well, let me ask you this before that. Were you aware that Mr. Fortenberry[, Sr.,] had some plans for maybe retiring or maybe passing the company along to the next generation?
>
> A.  Not until after he told us he was diagnosed with cancer.
>
> Q.  And when was that?
>
> A.  That was in, I believe, early July of 2000.
>
> \* \* \*
>
> Q.  And what did he tell you?

9

A.	He told me first about his cancer. He had just found out about it, and obviously was quite concerned. And also his wife was quite concerned. And he made the comment to me, he says, "Jim, I think I'm going to retire before you do." I had planned to retire in 2002. And I said, "Oh? Why is that?" And then he told me he had been diagnosed with cancer and needed to start making some plans at that point.

Q.	Did he talk with you about—actually, did he ask you to help him, or help those who would be taking the company to the next—to the next stage?

A.	Yes.

Q.	Explain that to us, please.

A.	We talked about that right after the—we had a conversation about his cancer. And he said that it was his plan to leave the business to the two families, to the Cavanaughs and the Fortenberrys. And they would all be on an equal basis. They would all have equal shares of the company. But he didn't elaborate on who was to do what. He didn't—he didn't indicate in any way that one person would be—would have one responsibility and the other would have another responsibility. He said he looked to the boys, as he called Jay and Dale, called them "the boys." He looked to the boys to run the company.

Tipton also testified that Fortenberry, Sr., asked him if he would be willing to serve as a fifth board member, and Tipton said that he would.

Other witnesses to testify for the Cavanaughs included Harper, Stroud, and their experts, Joseph Picken and Greg Skelton. Harper testified about his relationship with the company and the parties starting in 1997 and his time at the company as the receiver. Stroud testified that his company supplied materials to Fortune Products for approximately twenty years and to recent problems that he had with the company. Picken testified to the value of Fortune Products and the effect the deadlock between the parties has had on its value, and Skelton testified concerning

10

Fortenberry's submitted business expenses to the company.

The Fortenberrys' theory to the jury was that Fortenberry was within his authority as the president to manage and control the business on a day-to-day basis just as his father had done, including changing Cavanaugh's duties as expressed in the June 2004 letter. Fortenberry testified that his father, as president, "had the general and active management of the company day-to-day" and that "some of the functions or decisions he made on a day-to-day basis for the company" were "hiring employees," "setting salaries," "prescribing the duties of the employees of the company," "entering into leases," "borrowing money," and "signing checks."

The Fortenberrys called other witnesses that testified consistently that Fortenberry, Sr., made business decisions without involvement from his wife and that the agreement was for Fortenberry to run the business the same way that his father had. David Shepherd, a former employee of Fortune Products from 1997 to 2001, testified that Fortenberry, Sr., "was in complete control of the company" and that he never saw Betty Fortenberry "take part in any business-related decisions of any kind." Thomas Martin, a representative for Fortune Products to sell its product during the time that Fortenberry, Sr., owned the company, testified that, to his knowledge, Betty Fortenberry was not involved in the business "whatsoever" and that Fortenberry, Sr., told him that Fortenberry would "be running my company." Robert Glanville, the company's attorney, testified that Fortenberry, Sr., was "in charge" when he was there. James Obermier, who worked for Fortune Products from May 1998 to July 2000, testified that Fortenberry, Sr., "made the final word on everything." Randy Fortenberry, the brother of Fortenberry, Sr., who also worked in the business, testified that he had worked at the business starting in 1993, that his brother made the "ultimate" decisions when he was the president, that he was unaware of any part that Betty Fortenberry played

11

in business decisions, and that Fortenberry, Sr., told him that Fortenberry "was always going to make the ultimate decision with the company."

The Fortenberrys' witnesses also included Dan Durrenburger, an independent representative for a company that supplied product to Fortune Products, and Thomas Glass, the Fortenberrys' business valuation expert. Durrenburger testified that Fortenberry, Sr., told him that he thought that he had made a mistake bringing Cavanaugh on board. Glass testified that Fortune Products was not insolvent and that there was no threat of harm to the company in the foreseeable future.

The jury's findings included that the parties "agreed the company would be operated on a 50/50 basis, with neither party having final authority over the other," that the "directors of Fortune Products, Inc., are deadlocked in the management of the corporate affairs of the Company and that the shareholders are unable to break the deadlock," and "that such deadlock has caused or is threatening to cause irreparable injury to Fortune Products, Inc." The jury found that Fortenberry excluded the Cavanaughs from participation in the day-to-day operations of the Company; excluded Cavanaugh from contact with the company's sales people, distributors, or customers; prevented Cavanaugh from performing his duties as vice president; withheld information from the Cavanaughs about the company's operations; altered the company's computer system to deny Cavanaugh access; made purchases or entered into contracts not authorized by the board of directors; changed the locks in order to deny the Cavanaughs access to the company's property; signed company checks without authorization from the board of directors; and violated orders of the court regarding the company's operations. The jury also found that Fortenberry, Cavanaugh, and Mrs. Cavanaugh had failed to

comply with their fiduciary duties to Fortune Products, but the jury awarded no damages for the parties' respective failures to comply.

The jury declined to find that the Cavanaughs and the Fortenberrys agreed that "Dale Fortenberry, Jr., as President, would have final authority on all corporate decisions," that Fortenberry "dominate[d] control of the business and management" of the company or that he had misapplied the assets of the company, maliciously suppressed dividends from the company, usurped company opportunities for himself, received benefits that other shareholders did not receive, acted deliberately to reduce the value of the Cavanaughs' stock, or used company funds to pay personal expenses.

### *Proceedings after Trial*

After the jury trial and before the entry of final judgment, the Cavanaughs filed an application for the appointment of an interim receiver and, after a hearing, the trial court appointed Harper to serve as the receiver for the company.[4] The district court also held an evidentiary hearing on attorney's fees and the Cavanaughs' motions for contempt and for sanctions and on the entry of final judgment in November 2006. The district court ruled from the bench that it would "generally render judgment on behalf of the [Cavanaughs]" and confirmed the appointment of Harper as the receiver. The court also granted the Cavanaughs' request for attorney's fees and ordered an accounting.

In February 2007, the district court entered its final judgment in favor of the

---

[4] Harper has intervened in this appeal as the company's receiver and has filed briefs addressing the Fortenberrys' issues concerning the receivership.

13

Cavanaughs. The district court made declarations based on the jury's verdict and, as a matter of law, based on its finding that the bylaws were unambiguous. In the final judgment, the district court granted the Cavanaughs' request for an accounting and for permanent injunctive relief, awarded attorney's fees and costs to the Cavanaughs in the amount of $747,037.84, incorporated and confirmed the order appointing Harper as the receiver, and incorporated by reference separate orders for contempt and for sanctions.

In the separate order for contempt, the district court granted the Cavanaughs' motion for contempt, finding that Fortenberry "has engaged in extensive conduct since the Order Granting Temporary Injunction dated July 23, 2004, which has hindered, obstructed and damaged the ongoing business of Fortune Products, Inc. His repeated attempts to unilaterally control and operate the business have not only been in violation of the Court's order, but have in fact significantly harmed the business." The district court ordered Fortenberry to pay a penalty of $25,000 to the Cavanaughs and the Cavanaughs' attorney's fees for bringing the contempt motion, "which are included in the attorneys fees amounts as ordered in the Court's final judgment entered in this case."

After the Fortenberrys' motion for judgment notwithstanding the verdict and, in the alternative, motion for new trial was overruled, this appeal followed.

**ANALYSIS**

*Standard of Review*

The Fortenberrys' complaints on appeal include challenges to the district court's award of attorney's fees, its appointment of a receiver, and the jury charge. A trial court's award of attorney's fees, the appointment of a receiver, and complaint of jury charge error are reviewed under

14

an abuse of discretion standard. *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000) (standard of review for complaints of jury charge error); *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (standard of review for complaints that trial court erred in awarding attorney's fees pursuant to the Uniform Declaratory Judgments Act); *Abella v. Knight Oil Tools*, 945 S.W.2d 847, 849 (Tex. App.—Houston [1st Dist.] 1997, no writ) (standard of review for complaints that trial court erred in appointing a receiver). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

"The Declaratory Judgments Act entrusts attorney fee awards to the trial court's sound discretion, subject to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and to the additional requirements that fees be equitable and just, which are matters of law." *Bocquet*, 972 S.W.2d at 21. "The appointment of a receiver, either as authorized by statute or equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *Abella*, 945 S.W.2d at 849. To reverse a judgment based on a claimed error in the jury charge, a party also must show that the error "probably caused the rendition of an improper judgment." Tex. R. App. P. 44.1(a)(1); *see Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002) (error in refusing an instruction); *Niemeyer v. Tana Oil & Gas Corp.*, 39 S.W.3d 380, 387 (Tex. App.—Austin 2001, pet. denied) (error in jury charge).

The Fortenberrys further raise challenges to the legal and factual sufficiency of the evidence to support portions of the judgment. A legal sufficiency challenge may only be sustained when the record discloses one of the following situations:

(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of

law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; [or] (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)). In determining whether a finding is supported by legally sufficient evidence, we view the evidence in the light most favorable to the finding, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id*. at 807. We indulge every reasonable inference that would support the finding. *Id*. at 822. In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence in the record, including any evidence contrary to the judgment. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We set aside a finding for factual insufficiency "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain*, 709 S.W.2d at 176.

This appeal also involves issues of statutory construction and the district court's interpretation of the company's bylaws. We review matters of statutory construction *de novo*, and our primary goal is to determine and give effect to the legislature's intent. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). We begin with the plain language of the statute's words and apply their common meaning. *Id*. Where the statutory text is unambiguous, we generally adopt a construction supported by the statute's plain language. *Id*. Similarly, we review whether bylaws are ambiguous *de novo*, and we apply ordinary principles of contractual interpretation. *See, e.g.*, *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650-51 (Tex. 1999) (whether

contract is ambiguous is question of law). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We construe written instruments as a whole in an effort to harmonize and give effect to all the provisions of the instrument so that none will be rendered meaningless. *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id*.

### *Attorney's Fees*

In their first issue, the Fortenberrys contend that the district court erred in awarding attorney's fees because the Cavanaughs "are not, legally or factually, entitled" to an award of attorney's fees. The Fortenberrys contend that the Cavanaughs' claim for declaratory judgment was the only cause of action for which attorney's fees were recoverable, that it was "neither 'equitable' nor 'just' to award the Cavanaughs attorney fees," and that the jury's findings "were substantially against the Cavanaughs." They rely on the jury's findings that Fortenberry's conduct did not damage the company, that the Cavanaughs failed to comply with their fiduciary duties to the company, and that Fortenberry did not take actions that were at the Cavanaughs' expense. They further contend that the Cavanaughs incurred substantial attorney's fees unrelated to their declaratory judgment claim and that the Cavanaughs were required to segregate the attorney's fees that they incurred for their declaratory judgment claim from their other claims.

The issue of attorney's fees was tried to the district court, and an evidentiary hearing was held in November 2006. Both the Fortenberrys and the Cavanaughs sought their incurred

17

attorney's fees, their attorneys testified in support of their requests, and neither side attempted to segregate their attorney's fees. The district court awarded $747,037.84 to the Cavanaughs for their attorney's fees and costs, which included $45,861.24 in costs, $100,000 in attorney's fees on appeal, and $601,176 for trial level attorney's fees. The amount also included attorney's fees for the Cavanaughs' bringing a motion for contempt and for sanctions. The Cavanaughs provided billing records as exhibits and testimony to support the award of incurred attorney's fees at the trial court level.

The Fortenberrys did not request findings of fact and conclusions of law as to the district court's award of attorney's fees. *See* Tex. R. Civ. P. 296. On matters tried to the court, where findings of facts and conclusions of law are not requested or filed, it will be implied that the trial court made all the findings necessary to support its judgment. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam); *Toles v. Toles*, 45 S.W.3d 252, 264 (Tex. App.—Dallas 2001, pet. denied); *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 577 (Tex. App.—Austin 2000, no pet.). "In determining whether some evidence supports the judgment and the implied findings of fact, 'it is proper to consider only that evidence most favorable to the issue and to disregard entirely that which is opposed to it or contradictory in its nature.'" *Worford*, 801 S.W.2d at 109 (quoting *Renfro Drug Co. v. Lewis*, 235 S.W.2d 609, 613 (Tex.1950)). The judgment must be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Id.* We, therefore, must affirm the district court's award of attorney's fees if the award can be upheld on any legal theory that finds support in the evidence. *See id.*

Attorney's fees are not recoverable unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006); *Strayhorn v. Raytheon*

18

*E-Systems, Inc.*, 101 S.W.3d 558, 571 (Tex. App.—Austin 2003, pet. denied). The parties did not have an agreement that provided for attorney's fees; the attorney's fee award then must be authorized by statute. The Cavanaughs contend that the district court's award of attorney's fees is supported by their claim pursuant to the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008). Pursuant to section 37.009 of the UDJA, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Id*. The Cavanaughs also contend that attorney's fees were recoverable pursuant to (i) articles 2.44(B) and (D) and 5.14(j) of the Texas Business Corporation Act and (ii) their motion for contempt. *See* Tex. Bus. Corp. Act Ann. arts. 2.44(B), (D) (directors' access to corporation's records with provision for award of attorney's fees), 5.14(j) (derivative proceeding provision that allows attorney's fees at conclusion of proceeding) (West 2003). Because we presume the district court awarded attorney's fees to the Cavanaughs based on their claim for declaratory relief, we need not address the Cavanaughs' additional grounds. *See Worford*, 801 S.W.2d at 109.[5]

In arguing that an award under the UDJA would not be "equitable" or "just," the

---

[5] Absent a contractual or statutory basis, a trial court lacks authority to award attorney's fees based upon a contempt finding. *See Kennedy v. Kennedy*, 125 S.W.3d 14, 19 n.4 (Tex. App.—Austin 2002, pet. denied); *Equitable Trust Co. v. Lyle*, 627 S.W.2d 824, 826 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.). The plain language of articles 2.44(B) and (D) and 5.14(j), however, authorize attorney's fees. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). Pursuant to article 2.44(B), a court may award a director attorney's fees that the court "deems just and proper." *See* Tex. Bus. Corp. Act Ann. art. 2.44(B) (West 2003). Article 2.44(D) provides that a corporation that refuses to allow a shareholder to examine the corporate records "shall be liable to such shareholder for all costs and expenses, including attorneys' fees." *See id.* art. 2.44(D) (West 2003). Similarly, article 5.14(j) authorizes a court to award attorney's fees on "termination of a derivative proceeding." *See id.* art. 5.14(j) (West 2003). We conclude that the trial court did not abuse its discretion in awarding attorney's fees pursuant to the UDJA.

Fortenberrys rely on the jury's findings that the Cavanaughs did not comply with their fiduciary duties to the company and that Fortenberry's actions did not damage the company or the Cavanaughs and their contentions that the Cavanaughs incurred substantial fees on claims unrelated to their claim for declaratory judgment and that the jury findings were against the Cavanaughs. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009. The jury declined to find that Fortenberry's actions injured the company or the Cavanaughs, and it was undisputed that the Cavanaughs removed Fortenberry as a signatory on company bank accounts without his agreement and without board authorization during the pendency of this case. The Cavanaughs' actions to remove Fortenberry as a signatory, however, occurred after Fortenberry wrote checks on the company's accounts without the Cavanaughs' knowledge or approval, and the bylaws provide that Mrs. Cavanaugh as the treasurer had "custody of the corporate funds." There was also evidence that Fortenberry repeatedly committed acts to hinder the Cavanaughs' involvement in and knowledge of the company's affairs.

In granting attorney's fees pursuant to the UDJA, the district court, consistent with the jury's verdict, could have found that the Cavanaughs prevailed on their claim for declaratory relief—that the agreement between the parties was to manage the business on a 50/50 basis—and that, based on the parties' conduct and explanations for their conduct, it was "equitable" and "just" to award attorney's fees to the Cavanaughs.[6] *See id.* On this record, we cannot say that it was an abuse of discretion for the district court to award attorney's fees to the Cavanaughs pursuant to the UDJA.

---

[6] The Cavanaughs also argue that a party does not have to substantially prevail to recover fees under the UDJA. *See, e.g.*, *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996) (fee award not dependent on finding that a party "substantially prevailed"); *G. Prop. Mgmt., Ltd. v. Multivest Fin. Servs. of Tex., Inc.*, 219 S.W.3d 37, 53-54 (Tex. App.—San Antonio 2006, no pet.) ("The Declaratory Judgment Act does not limit an award of attorney's fees only to a prevailing party."). We need not address this additional argument because we conclude that the Cavanaughs prevailed on their claim for declaratory relief.

20

Having concluded that the district court did not abuse its discretion in awarding attorney's fees pursuant to the Cavanaughs' claim for declaratory relief, we turn to the issue of segregation of attorney's fees. The Cavanaughs contend that the Fortenberrys did not preserve the issue of segregation for our review because they did not object on that basis when the Cavanaughs presented their evidence of attorney's fees. *See, e.g.*, *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997) ("if no one objects to the fact that the attorney's fees are not segregated as to specific claims, then the objection is waived"); *McCalla v. Ski River Dev., Inc.*, 239 S.W.3d 374, 383 (Tex. App.—Waco 2007, no pet.) (to preserve complaint that the opposing party failed to segregate its attorney's fees, "[g]enerally, such an issue is preserved by objection during testimony offered in support of attorney's fees or an objection to the jury question on attorney's fees"); *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 454 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (objection to failure to segregate preserved through objection to charge); *Apache Corp. v. Dynegy Midstream Servs.*, 214 S.W.3d 554, 566 (Tex. App.—Houston [14th Dist.] 2006, pet. granted) (failure to object waives opposing party's failure to segregate). The Cavanaughs contend that, because the Fortenberrys did not object at the hearing when the evidence was being presented, the district court did not have the opportunity to correct any error and thus any error was waived. *See* Tex. R. App. P. 33.1(a)(1) (to preserve complaint for appellate review, the complaint must be made to the trial court by "a timely request").

The Fortenberrys respond that the Cavanaughs had an affirmative obligation to segregate their attorney's fees between recoverable and unrecoverable claims, which they failed to do and that they were not required to object because the Cavanaughs' position was that their attorney's fees "could not" be segregated:

21

> [The Cavanaughs] admit that they presented testimony that no attempt was made to segregate and that they could not segregate. Under this scenario, there is no requirement to ask [the Cavanaughs] to do what they had already stated that they could not do and they need not be placed on notice to do what they had already stated they could not do.

The Fortenberrys overstate the testimony of the Cavanaughs' attorney to the district court.

The Cavanaughs' attorney testified without objection to the amount, reasonableness, and necessity of the attorney's fees that the Cavanaughs incurred and that segregation was not required:

> In looking at the issue of whether the time could be segregated out, my evaluation of the case was that the fundamental dispute was always control of the corporation and in finding an understanding of who was going to be in control of the corporation, and the receivership was simply a remedy that was one way in which the dispute over control could be resolved. And so I considered the dispute over control of the corporation, who is in control, to be a central issue in this case and inextricably intertwined with all the activity that occurred in the case.[7]

The attorney also stated at the hearing that they presented detailed billing records in the event "the court for some reason decides that segregation is necessary, that's one of the reasons that we put in the month-by-month calculus, and we provided the individual detail for the accounts, if the Court sees something that it doesn't think ought to be included, fine, mark it out." The records were admitted as exhibits without objection. During cross-examination, the attorney testified as to the Cavanaughs' various claims that "I've not attempted to do that [segregation] because we believe they're inextricably intertwined." The Cavanaughs' position was not that they "could not" segregate but that on this record it was not required.

---

[7] The Cavanaughs deducted attorney's fees that they incurred in a separate matter concerning Randy Fortenberry from the total amount in the billing records submitted to the district court.

The Fortenberrys' attorney similarly testified during cross-examination that the Fortenberrys were seeking all of their attorney's fees pursuant to their declaratory judgment action:

> Q.  And are you asking the Court to award all of the fees that you've testified to, to the defendant, pursuant to its claim under the declaratory judgment motion?
>
> A.  I'm asking that the Court award our fees under the declaratory judgment action, which is the defense of the claims made by the plaintiffs in this case that we had no choice but to defend the claims that once they were made.

Both the Fortenberrys and the Cavanaughs sought their incurred attorney's fees, their attorneys testified to support their requests, neither side attempted to segregate attorney's fees, and the parties did not object to the opposing parties' failure to segregate attorney's fees prior to the district court ruling from the bench that it was awarding attorney's fees to the Cavanaughs.[8] On this record, by failing to object at the hearing on attorney's fees, we conclude that the Fortenberrys have not preserved this issue for our review. *See id.*

Even if the Fortenberrys had preserved this issue, we would conclude that the district court did not abuse its discretion in the amount of attorney's fees awarded. Pursuant to the supreme court's guidelines, a claimant must segregate attorney's fees between claims for which attorney's fees are recoverable and those for which fees are not recoverable. *Chapa*, 212 S.W.3d at 313. When

---

[8] Prior to the district court's entry of the final judgment in February 2007, the parties filed supplemental briefing on the issue of segregation of attorney's fees. The Fortenberrys argued in their supplemental briefing that the Cavanaughs were required to segregate their attorney's fees pursuant to *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006), which was released by the supreme court shortly after the hearing on attorney's fees. In *Chapa*, the supreme court modified and clarified the exception for segregation of fees, but the complaining party in that case raised objection to the failure to segregate fees "during and after trial." *Id*. at 310. The Fortenberrys contend that they were not required to object and have not argued that their supplemental briefing to the district court preserved the issue for this Court's review. We, therefore, have not considered the supplemental briefing in reaching our decision that the Fortenberrys failed to preserve this issue.

23

legal services advance both recoverable and unrecoverable claims, however, the services are so intertwined that the associated fees need not be segregated. *Id*. at 313-14. The need to segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Id*. at 312-13.

The Fortenberrys argue that the only claim on which the Cavanaughs could recover attorney's fees was their claim for declaratory relief.[9] In particular, they contend that the UDJA may not be used to recover attorney's fees incurred in the appointment of a receiver. *See* Tex. Bus. Corp. Act. Ann. art. 7.05 (West 2003) (appointment of receiver to rehabilitate corporation). The Fortenberrys also rely on the Cavanaughs' pleadings after the trial court granted partial summary judgment in January 2006 to contend that segregation was required. At that time, the Cavanaughs requested that the district court render a final judgment on the parties' declaratory claims and sever the declaratory claims from the other claims, arguing that the declaratory claims were "not so interwoven with the remaining action that they involve the same facts and issues." The district court, however, denied the Cavanaughs' request for severance.

The Fortenberrys did not provide controverting testimony or object to the Cavanaughs' attorney's testimony that "I considered the dispute over control of the corporation, who is in control, to be a central issue in this case and inextricably intertwined with all the activity that occurred in this case." The Fortenberrys also continue to seek all of their attorney's fees based on their own declaratory action on appeal. That they seek the very same recovery that they argue the Cavanaughs may not undermines their position and is further support for the district court's award.

---

[9] The Cavanaughs' causes of action included claims for declaratory relief, breach of contract, breach of fiduciary duties, an application for the appointment of a receiver, an action for an accounting, and claims for temporary and permanent injunctive relief.

Because the Fortenberrys did not request findings of fact and conclusions of law, we may imply a finding by the trial court that the Cavanaughs met their burden that they were not required to segregate their incurred attorney's fees. *See Worford*, 801 S.W.2d at 109; *Toles*, 45 S.W.3d at 264. We conclude that the district court could have found that the legal services provided to the Cavanaughs advanced both recoverable and unrecoverable claims so that the services were "so intertwined that [the attorney's fees] need not be segregated." *See Chapa*, 212 S.W.3d at 314.

Although the jury made findings in favor of the Fortenberrys, the jury, as well as the judge, resolved the control issues that were the subject of the Cavanaughs' claim for declaratory relief in the Cavanaughs' favor. Based on the record before us and under the circumstances of this case, we cannot conclude that the trial court abused its discretion in awarding $747,037.84 in attorney's fees and costs to the Cavanaughs. We overrule the Fortenberrys' first issue.

### Declaratory Judgment

In their second issue, the Fortenberrys contend that the evidence is legally and factually insufficient to support declaratory judgment in favor of the Cavanaughs and that the Fortenberrys are entitled to declaratory judgment as a matter of law and their attorney's fees based on the unambiguous bylaws. Alternatively, the Fortenberrys request this Court to reverse the declaratory judgment and remand for a new trial.[10] The Fortenberrys contend, based on the unambiguous bylaws, that Fortenberry as president has the authority to hire and fire employees, enter contracts on behalf of the company, expend money for corporate purposes, sign on company bank

---

[10] The Cavanaughs contend that the Fortenberrys have waived their issues on the declaratory judgment and the jury charge by inadequate briefing. *See* Tex. R. App. P. 38.1(h). To the extent the Fortenberrys address particular declarations and jury charge questions and instructions, we conclude that the Fortenberrys have not waived their complaints.

25

accounts, and prescribe duties for employees not in conflict with the bylaws. In particular, the Fortenberrys contend the bylaws authorized Fortenberry to prescribe Cavanaugh's duties as stated in the June 2004 letter.

### 1. Interpretation of Bylaws

The Fortenberrys rely on the first sentence in section 5.07 and section 5.09 of the bylaws to support their interpretation that the bylaws authorize Fortenberry to act on behalf of the company without specific board authorization. The first sentence of section 5.07 states that "[t]he Board of Directors, except as otherwise provided in these Bylaws, may authorize any officer to enter into any contract or execute and deliver any instrument in the name of and on behalf of the corporation, and such authority may be general or confined to specific instances." Section 5.09 states that the "President shall be the chief executive officer of the corporation, shall have general and active management of the business of the corporation, and shall see that all orders and resolutions of the Board of Directors are carried into effect."

Relying on these two sections, the Fortenberrys contend that section 5.07 authorizes the board of directors to generally delegate its authority, and that, in section 5.09, the board of directors generally delegated to the president the "management" of the company, similar to the duties of a "general manager" which is "a very broad delegation of power by the board of directors." Relying on article 2.31(A) of the business corporation act, the Fortenberrys further contend that "the board of directors of Fortune Products chose to generally delegate the 'management' of the company, which is the exact term and the entirety of the authority held by a board of directors as stated in the

26

Texas Business Corporation Act." *See* Tex. Bus. Corp. Act Ann. art. 2.31(A) (West 2003).[11]  The

Fortenberrys contend that their interpretation is consistent with the board's historical delegation of

the company's management generally to Fortenberry, Sr., including his authority to prescribe other

officers' duties, and that this general delegation remained when Fortenberry became president.

The district court agreed with the Fortenberrys that the bylaws were not ambiguous

and that they should be interpreted as a matter of law but disagreed with the Fortenberrys'

interpretation.  The district court interpreted the bylaws to limit the president's authority to take

certain actions without board authorization, including changing the duties of other officers.  The

district court explained its interpretation in the following findings:

   a.     Defendant Dale Fortenberry, Jr., has no inherent powers by virtue of his office as President to bind Fortune Products, except as to routine matters arising in the ordinary course of business. [Order Granting Plaintiffs' MSJ No. 2];

   b.     Defendant Dale Fortenberry, Jr., has no power or authority to set, increase, reduce or discontinue the wages or salary of any officer or employee of Fortune Products, except as authorized by the Board of Directors of Fortune Products. [Order Granting Plaintiffs' MSJ No. 5];

   c.     Plaintiff Jay Cavanaugh, as Vice President, is authorized, in the absence or disability of the President, to perform the duties and have the authority and exercise the powers of the President. [Order Granting Plaintiffs' MSJ No. 8];

   d.     Plaintiff Jay Cavanaugh, as Vice President, shall perform such other duties and have such other authority and powers as the Board of Directors of Fortune Products may delegate.  [Order Granting Plaintiffs' MSJ No. 9];

---

[11]  Article 2.31(A) of the business corporation act provides that "the powers of a corporation shall be exercised by or under the authority of, and the business and affairs of a corporation shall be managed under the direction of, the board of directors of a corporation."  Tex. Bus. Corp. Act Ann. art. 2.31(A) (West 2003).

e.    Pursuant to the Bylaws of Fortune Products, there are limits on the President's employee and management authority and responsibility. These are found, principally, in § 5.03 of the Fortune Products Bylaws, and include the following:

  1.    The power to hire officers and employees for such length of time and on such terms as the Board chooses; and
  2.    The power to fix the salaries of officers and employees.

    Moreover, the President's managerial authority is limited by the express duties of the vice-president, the chairman of the board, the secretary and the treasurer set out in the Bylaws. [Order Granting MSJ at p. 4];

f.    Pursuant to the Bylaws of Fortune Products, Defendant Dale Fortenberry has no power or authority to bind Fortune Products to any contract or engagement or to pledge its credit or to render it liable pecuniarily for any purpose or in any amount, unless authorized to do so by the Board of Directors of Fortune Products [Bylaws of Fortune Products at § 5.07];

g.    Pursuant to the Bylaws of Fortune Products, Defendant Dale Fortenberry has no power or authority to delegate or to remove any duties or other authority of Plaintiff Gerald Cavanaugh, as Vice President of Fortune Products [Bylaws at § 5.10];

h.    Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as Vice President, is authorized, in the absence or disability of the President, to perform the duties and have the authority and exercise the powers of the President [Bylaws at § 5.10]; and

i.    Pursuant to the Bylaws of Fortune Products, Plaintiff Gerald Cavanaugh, as Vice President, shall perform such other duties and have such other authority and powers as the Board of Directors of Fortune Products may delegate [Bylaws at § 5.10].

    We agree that the bylaws are unambiguous and interpret them as a matter of law. *See*

*Coker*, 650 S.W.2d at 393. Turning to the sections that the Fortenberrys rely on for the president's

authority, the Fortenberrys' interpretation of section 5.07 and 5.09 ignores the plain language of

28

those sections and the bylaws as a whole. *See Khan*, 138 S.W.3d at 292. Section 5.07 expressly limits the board of director's authority to delegate "as otherwise provided in these Bylaws."[12] Moreover, because section 5.03 provides that the board of directors "shall have the power to enter into contracts for the employment and compensation of officers and employees on such terms and for such length of time as the Board deems advisable," the plain language of section 5.07 does not support an interpretation that the board of directors may generally authorize the president to enter into contracts of employment.

Similarly, the scope of the delegation in section 5.09 to the president to "manage" the company, must be construed in context with the bylaws as a whole, including section 5.03 that reserves to the board of directors the power to enter into employment contracts, the sections that set out the duties of other officers, and section 3.01 that provides that the board of directors will manage the company. Section 3.01 of the bylaws states that "the business and affairs of the corporation shall be governed and managed by its Board of Directors." Section 5.08 provides that the chairman of the board "shall have such powers and duties as may from time to time be prescribed by the Board of Directors, upon written direction given to him pursuant to resolution duly adopted by the Board of Directors." Section 5.10 provides that vice-presidents "shall, in the absence or disability of the President, perform the duties and have the authority and exercise the powers of the President" and "shall perform such other duties and have such other authority and powers as the Board of Directors

---

[12] The second sentence of section 5.07 also provides that unless authorized by the board of directors, "no officer, agent, or employee shall have any power or authority to bind the corporation by any contract or engagement or to pledge its credit or to render it liable pecuniarily for any purpose or in any amount."

may from time to time delegate." Section 5.13 states that the treasurer "shall have the custody of the corporate funds and securities," and section 5.14 states that the treasurer "shall disburse funds of the corporation as may be ordered by the Board of Directors." By expressly addressing officers' duties and authorizing the board of directors to set the officers' duties, the bylaws as a whole, at a minimum, limit the president's "management" authority in section 5.09 and do not authorize the president to prescribe other officers' duties. *See id.*

The cases that the Fortenberrys cite to support their argument that the bylaws delegated the company's management to the president are inapposite. *See San Antonio Joint Stock Land Bank v. Taylor*, 105 S.W.2d 650 (Tex. 1937); *Ennis Bus. Forms, Inc. v. Todd*, 523 S.W.2d 83 (Tex. Civ. App.—Waco 1975, no writ); *Miller v. A.&N. R.R. Co.*, 476 S.W.2d 389 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.).[13] In *Taylor*, the court states that "the rule is generally accepted that the president of a corporation may be entrusted by the board of directors with the management of the business of such corporation, and he may perform for the corporation the business it is authorized to transact." 105 S.W.2d at 654. Here, the dispute is not whether a board of directors may delegate its authority to a president, but the extent of any such delegation.

In *Todd*, the board of directors did not expressly authorize the employment contract with a non-officer employee, but the court found that the president was authorized to execute the

---

[13] The Fortenberrys also cite *Mr. Eddie, Inc. v. Ginsberg*, 430 S.W.2d 5, 10 (Tex. Civ. App.—Eastland 1968, writ ref'd n.r.e.), for the general rule that "the president of a corporation has the authority to hire and discharge employees." The employee at issue in *Ginsberg* was not an officer, and the president was also the principal shareholder. *Id.* at 7, 10. In contrast, the bylaws in this case expressly authorize the board of directors to set terms of employment; Cavanaugh is the vice president, a shareholder, and the chairman of the board; and Fortenberry is not the principal shareholder.

30

contract because the bylaws authorized the president to execute contracts "in the ordinary course." 523 S.W.2d at 86. The bylaws in this case are converse; section 5.07 expressly requires the board of directors to authorize an officer to execute a contract. In *Miller*, the court determined that the president was authorized to hire the general manager but, unlike the bylaws in this case, the bylaws specifically "provided for the appointment of a General Manager by the President." 476 S.W.2d at 393.

Construing the bylaws as a whole, we conclude that the district court did not err in its declarations based on the bylaws, including that the bylaws do not authorize Fortenberry, as the president, to prescribe Cavanaugh's duties. *See Khan*, 138 S.W.3d at 292; *see also Templeton v. Nocona Hills Owners Assn, Inc.*, 555 S.W.2d 534, 538 (Tex. Civ. App.—Texarkana 1977, no writ) ("settled rule in Texas is that a corporation president, merely by virtue of his office, has no inherent power to bind the corporation except as to routine matters arising in the ordinary course of business"); *see also* Tex. Bus. Corp. Act Ann. art. 2.42(B) (West 2003) ("All officers . . . , as between themselves and the corporation, shall have such authority and perform such duties in the management of the corporation as may be provided in the bylaws, or as may be determined by resolution of the board of directors not inconsistent with the bylaws.").

### 2. Sufficiency of Evidence to Support Jury Findings

Finding that the bylaws do not, as a matter of law, allow Fortenberry to prescribe Cavanaugh's duties, we next consider the Fortenberrys' challenge to the sufficiency of the evidence. Because the Fortenberrys globally challenge the legal and factual sufficiency of the district court's declarations, we review the district court's declarations based on the jury verdict to the extent the

31

Fortenberrys have addressed the particular declarations in their briefing.  See Tex. R. App. P. 38.1.

The district court made the following declarations based on the jury's verdict in favor of the

Cavanaughs:

a. The Plaintiffs, Jay Cavanaugh and Dianna Cavanaugh, and the Defendants, Roland D. Fortenberry, Jr. and Kaye Ann Fortenberry, agreed that the company would be operated on a 50/50 basis, with neither party having final authority over the other.  [Question  No. 1A]

b. The Plaintiffs, Jay Cavanaugh and Dianna Cavanaugh, and the Defendants, Roland D. Fortenberry, Jr. and Kaye Ann Fortenberry, did not agree that Defendant Dale Fortenberry, Jr., as President, would have final authority on all corporate decisions. [Question  No. 1A]

c. The directors of Fortune Products, Inc., are deadlocked in the management of the corporate affairs of the Company and the shareholders are unable to break the deadlock. [Question No. 2]

d. Such deadlock has caused or is threatening to cause irreparable injury to Fortune Products, Inc. [Question No. 3]

e. Defendant Dale Fortenberry, Jr., excluded Plaintiffs Jay Cavanaugh or Dianna Cavanaugh from participation in the day to day operations of the Company. [Question No. 4C]

f. Defendant Dale Fortenberry, Jr., excluded Plaintiff Jay Cavanaugh from contact with the Company's sales people, distributors and customers. [Question No. 4D]

g. Defendant Dale Fortenberry, Jr., prevented Plaintiff Jay Cavanaugh from performing his duties as Vice President. [Question No. 4E]

h. Defendant Dale Fortenberry, Jr., withheld information from Plaintiffs Jay and Dianna Cavanaugh about Fortune Products, Inc.'s operations. [Question No. 4F]

i. Defendant Dale Fortenberry, Jr., altered Fortune Products, Inc.'s computer system to deny Plaintiff Jay Cavanaugh access.  [Question No. 4G]

j.      Defendant Dale Fortenberry, Jr., made purchases or entered into contracts not authorized by the Board of Directors of Fortune Products, Inc. [Question No. 4K]

k.      Defendant Dale Fortenberry, Jr., changed the locks in order to deny Plaintiffs Jay and Dianna Cavanaugh access to Fortune Products, Inc.'s products. [Question No. 4L]

l.      Defendant Dale Fortenberry, Jr., signed checks on behalf of Fortune Products, Inc., without authority from the Board of Directors. [Question No. 4M]

m.      Defendant Dale Fortenberry, Jr., violated orders of the Court regarding Fortune Products, Inc. operations. [Question No. 4N]

The Fortenberrys' complaint is directed at the jury's findings concerning the parties' agreement as to the company's management and control. We limit our review of the evidence then to the declarations concerning the company's management and control.

Viewing the evidence in the light most favorable to the district court's declarations based on the jury verdict, the Cavanaughs testified that their agreement with the Fortenberrys was for the business to be managed with equal input, that the parties were deadlocked, and that the deadlock was causing injury to the company. Cavanaugh testified that the plan from the beginning was that the company would be equally owned, the board of directors evenly divided, and not that he would report to Fortenberry. Mrs. Cavanaugh testified that the agreement was to manage the business as her parents had—at the board level, and, in the event the families were unable to agree, the plan was for Tipton, a close friend of Fortenberry, Sr., to serve as the "tiebreaker." Tipton testified that Fortenberry, Sr., asked him if he would be willing to be a fifth board member. We conclude the evidence was legally sufficient to support the district court's declarations as to the management and control of the company based on the jury verdict. *See City of Keller*, 168 S.W.3d at 807, 810.

33

Viewing all of the evidence, the Fortenberrys provided controverting evidence that the parties' agreement was for Fortenberry, as the president, to control the company as it was controlled historically by Fortenberry, Sr.; that he was authorized, as the president, to take actions on behalf of the company, including prescribing Cavanaugh's duties, incurring indebtedness, and entering into contracts; and that the parties' deadlock had not injured the company. Fortenberry, Shepherd, Martin, and Randy Fortenberry testified that Fortenberry, Sr., managed and controlled the business and that he did so without involvement from Betty Fortenberry. There was evidence that Cavanaugh did not question the authority of Fortenberry, Sr., when he was the president, and Glass testified that there was no threat of harm to the company in the foreseeable future.

The Fortenberrys also rely on documentary evidence: a letter dated May 31, 1990, to all personnel from Fortenberry, Sr., advising them that Fortenberry was appointed to the position of vice president, and that, in his absence, Fortenberry "will be in charge of all day to day activities"; Fortenberry, Sr.'s appointment of Randy Fortenberry in 1995 to the position of production manager; and the memorandum from Fortenberry, Sr., to all personnel that advised them of Cavanaugh's position as vice president of finance and administration. The Fortenberrys argue that, because Fortenberry, Sr., initially set Cavanaugh's terms of employment as well as other employees' terms of employment, that Fortenberry, as the succeeding president, was authorized to change employment terms on behalf of the company and that a declaration from the court to that effect would resolve the parties' deadlock.

The Cavanaughs' testimony as to the company's management structure, however, was consistent with the district court's interpretation of the bylaws, the equal ownership of the company's

34

shares, the evenly-divided board of directors, the shareholders agreement requiring the shareholders to vote for each other as directors, and the company's minutes. When the parties met as shareholders and as a board of directors for their annual meetings from 2000 to 2002, the minutes reflect that the directors resolved that "all proceedings of the board of directors since the last meeting of shareholders, and all acts taken by members of the board of directors or by officers of the corporation, are hereby ratified and approved in all respects." These annual resolutions are consistent with the directors managing the business on an equal basis. The minutes also reflect that a special meeting was held on September 5, 2000, for the purpose of "considering new business strategies to grow the business." Occurring shortly after the purchase, this meeting supports the Cavanaughs' position that the agreement was for business decisions to be made at the board level.

The minutes during the time period that the company's directors were Fortenberry, Sr., and Betty Fortenberry also support that the agreement was for the company to be managed and controlled at the board level. The minutes reflect that, from 1984 until the sale in 2000, the directors, Fortenberry, Sr., and Betty Fortenberry, elected officers annually and made decisions at the board level including to relocate the business, to purchase a company car, to pay shareholders' dividends, and to promote Fortenberry to vice president. Minutes from annual meetings during this time also contain resolutions ratifying and approving the actions of the directors and officers.

The parties presented conflicting evidence of their agreement and conduct surrounding the company's day-to-day management. The jury could have resolved the conflicting evidence to conclude that Fortenberry, Sr., and Betty Fortenberry managed the company from the board level or, even if Fortenberry, Sr., unilaterally made business decisions for the company,

35

Fortenberry did not have the same authority as his father who was president, majority shareholder, and chairman of the board. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986) (fact finder is "the sole judge of the credibility of the witnesses and the weight to be given their testimony," may believe one witness, disbelieve others, and "resolve inconsistencies in the testimony of any witness"). The jury resolved the conflicts as to the parties' agreement in the Cavanaughs' favor. We conclude that the district court's declarations based on the jury verdict were not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176. We overrule the Fortenberrys' second issue.

### *Jury Charge Error*

In their third issue, the Fortenberrys contend that jury questions 1A, 1B, 3, and 4 and accompanying instructions were erroneous, probably caused the rendition of an improper judgment, and cannot provide a basis for the district court's judgment. Question 1A asked the jury what the parties agreed as to the company's management and operation; question 1B asked the jury to interpret the bylaws; question 3 asked the jury whether the directors' deadlock was causing irreparable injury to the company; and question 4 asked the jury if Fortenberry had engaged in certain actions.

The Fortenberrys contend that question 1A was erroneous because "the Court asked the jury to determine if there was some collateral agreement, other than the bylaws, reached as of August 1, 2000, to 'operate' the company on a '50/50 basis'" and that the district court erred in submitting questions 1A and 1B and rendering judgment based on the jury's answers because the questions had "no relevance to the controlling issue in the declaratory judgment—what is the nature

36

and extent of the corporate president's authority as reflected in the corporate bylaws?" They contend that the district court should have determined the issue of authority as a matter of law based on the unambiguous bylaws. They also contend that question 1A contains instructions and definitions "which are substantially erroneous and constitute misstatements of the law" because the jury was allowed to consider all the evidence admitted at the trial, including the parties' conduct and the history of the company.

Question 1A and 1B to the jury, in relevant part, were as follows:

Question 1A

Did the Plaintiff Cavanaughs and the Defendant Fortenberrys agree that as of August 1, 2000, the company would be operated on a 50/50 basis, with neither party having final authority over the other, or did they agree that Dale Fortenberry, Jr., as President, would have final authority on all corporate decisions.

Agreements may be expressed or demonstrated by the course of dealings between the parties. You may consider all of the evidence admitted in this case, including the parties' conduct, the bylaws of Fortune Products, Inc. and the history of the company.

Question 1B

It is your duty to interpret the bylaws of Fortune Products, Inc.

Under the Bylaws, does the President, Dale Fortenberry, Jr. or some other officer of the Company have the final authority to do the following, or do the following require action of the Board of Directors?

* * *

Consider all of the facts and circumstances surrounding the adoption of the bylaws, the interpretation placed on the bylaws by the parties, the conduct of the parties and the course of dealing of the parties.

A "course of dealing" is a sequence of previous conduct between the parties under the bylaws which is fairly to be regarded as establishing a common basis of understanding the bylaws.

37

You may consider all of the evidence admitted in this case, including the parties' conduct, the bylaws of Fortune Products, Inc. and the history of the company.

1.      decide whether to reimburse an expense incurred by a company employee as a business expense?

2.      determine who has signature authority on company bank accounts including, but not limited to, the IBC bank account and the Merrill Lynch account?

3.      hire and fire employees?

The jury answered question 1A by finding that the parties agreed to operate the business on a "50/50" basis and answered "no" to each question in 1B, except the jury found that board action was required to determine who has signature authority on company bank accounts.

Even if we were to conclude that the district court erred in submitting questions 1A and 1B with their accompanying instructions to the jury, the jury's answers to question 1B were not incorporated in the final judgment and, as to question 1A, the jury's answer that the parties agreed to operate the business on a "50/50 basis" is consistent with the district court's interpretation of the bylaws, including that the bylaws limit Fortenberry's authority as the president to prescribe the duties of other officers. Having concluded that the district court did not err in its interpretation of the bylaws, we conclude that any error in submitting questions 1A and 1B did not probably cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1).

The Fortenberrys' complaint as to question 3 is that the district court erred by refusing to include a definition of "irreparable injury." Question 3 asked the jury:

Do you find that such deadlock has caused or is threatening to cause irreparable

injury to Fortune Products, Inc.?

The Fortenberrys contend that "irreparable injury" is not a term with which ordinary jurors can be expected to be familiar and that the jury should have been instructed that "[a]n injury is 'irreparable' if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." Question 3 is relevant to the district court's appointment of a receiver, and it was for the district court to determine whether to appoint a receiver pursuant to the applicable statutes. *See* Tex. Bus. Corp. Act Ann. art. 7.05; Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(3), (6) (West 2008). Even if we were to conclude that the trial court erred in refusing to include a definition of "irreparable injury," we conclude that any error did not probably cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1).

Question 4 asked the jury if Fortenberry, Jr., had engaged in certain actions:

Do you find that Dale Fortenberry, Jr., engaged in any of the following actions?

* * *

You are instructed that Dale Fortenberry, Jr., is responsible for his actions as well as those persons, if any, who acted with him with knowledge of, agreement with, and intention to accomplish a common objective or course of action.

You are instructed that Jay and Dianna Cavanaugh, as directors of Fortune Products, Inc., are entitled to have access to and inspect all books and records of Fortune Products, Inc.

A. Misapplied the assets of Fortune Products, Inc.?

B. Maliciously suppressed dividends from Fortune Products, Inc.?

C. Excluded Jay or Dianna Cavanaugh from participation in the day to day operations of the company?

D. Excluded Jay Cavanaugh from contact with the Company's sales people, distributors, or customers?

39

E.      Prevented Jay Cavanaugh from performing his duties as Vice President?

F.      Withheld information from Jay and Dianna Cavanaugh about Fortune Products, Inc. operations?

G.      Altered Fortune Products, Inc.'s computer system to deny Jay Cavanaugh access?

H.      Usurped corporate opportunities for Fortune Products, Inc. for himself?

I.      Received benefits that other shareholders of Fortune Products, Inc. did not receive?

J.      Acted to deliberately reduce the value of the Cavanaughs' stock?

K.      Made purchases or entered into contracts not authorized by the Board of Directors of Fortune Products, Inc.?

L.      Changed the locks in order to deny Jay and Dianna Cavanaugh access to Fortune Products, Inc. property?

M.      Signed checks on Fortune Products, Inc. without authority from the Board of Directors?

N.      Violated orders of the Court regarding Fortune Products, Inc. operations?

O.      Used Fortune Products, Inc. funds to pay personal expenses?

In their briefing to this Court, the Fortenberrys fail to address how the submission of this question was error or how it caused the rendition of an improper judgment. They also rely on the jury's negative findings to question 4 to support their own arguments. They, therefore, have waived any error in the submission of question 4. *See* Tex. R. App. P. 38.1(h). Additionally, even if we were to conclude that the district court's submission of question 4 was in error, we conclude that any such error did not probably cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). We overrule the Fortenberrys' third issue.

*Receivership*

In their fourth issue, the Fortenberrys contend that the evidence is legally and factually insufficient to support the district court's judgment appointing a receiver. In the final judgment, the district court found that the appointment of a receiver was "required to conserve the assets and business of Fortune Products, Inc., and to avoid damage to parties in interest, in accordance with Article 7.05 of the Texas Business Corporation Act, Section 64.001 et seq. of the Texas Civil Practice and Remedies Code, and the equitable powers of the Court." The district court "incorporated herein by reference for all purposes as if fully set forth verbatim" the order appointing receiver dated October 27, 2006, and confirmed the appointment of Harper as the receiver pursuant to the terms of the October 27, 2006, order. The Fortenberrys did not request findings of fact and conclusions of law as to the receivership order. We, therefore, will uphold the appointment on any legal theory supported by the record. *See Worford*, 801 S.W.2d at 109.

Article 7.05 of the business corporation act provides for the appointment of a receiver to rehabilitate a corporation as follows:

A.  A receiver may be appointed for the assets and business of a corporation by the district court for the county in which the registered office of the corporation is located, whenever circumstances exist deemed by the court to require the appointment of a receiver to conserve the assets and business of the corporation and to avoid damage to parties at interest, but only if all other requirements of law are complied with and if all other remedies available either at law or in equity, including the appointment of a receiver for specific assets of the corporation, are determined by the court to be inadequate, and only in the following instances:

(1)  In an action by a shareholder when it is established:

(a)  That the corporation is insolvent or in imminent danger of insolvency; or

41

(b)     That the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock, and that irreparable injury to the corporation is being suffered or is threatened by reason thereof; or

(c)     That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or

(d)     That the corporate assets are being misapplied or wasted.

(e)     That the shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election and qualification of their successors.

Tex. Bus. Corp. Act Ann. art. 7.05(A)(1). Section 64.001 of the civil practice and remedies code provides that a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund" or "in any other case in which a receiver may be appointed under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a)(3), (6).

As a preliminary matter, the Cavanaughs contend that this Court lacks jurisdiction to address Harper's appointment as a receiver because the Fortenberrys should have appealed his appointment within twenty days of October 27, 2006, the date the district court entered its order initially appointing Harper to be the receiver, and that the Fortenberrys' remedy at this point is to file a motion to terminate the receivership. *See Sclafani v. Sclafani*, 870 S.W.2d 608, 611 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (distinguishing between an action to terminate a receivership with an action to set aside the receivership). The Fortenberrys counter that, although they could have filed an interlocutory appeal from the October 27, 2006, order appointing Harper as the receiver, they also may appeal the appointment from the final judgment.

Rule 26.1(b) of the rules of appellate procedure provides that an interlocutory appeal "must be filed within 20 days after the judgment or order is signed." Tex. R. App. P. 26.1(b). Section 51.014(a)(1) of the civil practice and remedies code provides that a party "may appeal from an interlocutory order" that "appoints a receiver." Tex. Civ. Prac. & Rem. Code § 51.014(a)(1) (West 2008); *see also* Tex. Gov't Code Ann. § 311.016(1) (West 2005) ("'May' creates discretionary authority or grants permission or a power."). The parties agree that the Fortenberrys had the right to file an interlocutory appeal from the October 27, 2006, order appointing Harper. The issue then is whether the Fortenberrys were required to bring an interlocutory appeal from the initial appointment to preserve error. If the Fortenberrys were required to file an interlocutory appeal to preserve error, the Fortenberrys' notice of appeal in May 2007 was not timely, and this Court lacks jurisdiction.

The Fortenberrys rely on *Wilkins v. State Farm Mutual Automobile Insurance Co.*, 58 S.W.3d 176, 179 (Tex. App.—Houston [14th Dist.] 2001, no pet.), and the fact that the order appointing Harper was titled an "interim" order to support their contention that they may appeal Harper's appointment as part of the appeal from the final judgment. The Fortenberrys' argument that the receivership order was an "interim" order is unpersuasive; the order's expressed terms allowed for the receivership to continue for three years. In *Wilkins*, the appellant did not challenge the receivership itself, but that the "trial court lacked jurisdiction to enter the turnover order because a turnover order can only follow from a final judgment." *Id*. at 178. Our sister court found that it had jurisdiction to hear the appeal from the turnover order even though the appeal was not filed within twenty days of the turnover order by concluding the order was final, distinguishing the appointment of a receiver that "begins a proceeding" from a turnover order "even though it may appoint a

43

receiver." *Id*. at 179-80. In contrast, the Fortenberrys challenge the receivership itself.

Our sister courts that have addressed this issue have concluded that the "right to appeal the order of receivership itself must be exercised within twenty days after the receivership order is entered." *See Long v. Spencer*, 137 S.W.3d 923, 926 (Tex. App.—Dallas 2004, no pet.) (citing *Sclafani*, 870 S.W.2d at 611). In *Long*, the appellant appealed from the trial court's judgment disbursing the proceeds from the sale of real property in a suit for partition. 137 S.W.3d at 924-25. Because the initial appointment of the receiver was by agreed order, the court concluded that the "general receiver-based complaints and complaints concerning the original receiver were appealable after entry" of the agreed order. *Id*. at 926 n.2. The court dismissed the issues raised concerning the initial appointment for lack of jurisdiction because "[a] challenge to the receivership order after twenty days has passed is untimely and will be dismissed by the appellate court." *Id*. at 926 (citing *Sclafani*, 870 S.W.2d at 613).

In *Sclafani*, the court dismissed the appeal from the overruling of a motion to set aside a receivership for lack of jurisdiction, explaining the policy reasons behind the twenty-day requirement for appealing the establishment of a receiver:

> A contrary holding would mean that a party could rightfully attempt to set aside an order of receivership in an appeal regardless of how long ago the receivership order was entered. The setting aside of an order of receivership has "the effect of nullifying all intervening acts of the receiver . . . or, at least, of raising serious questions concerning the validity of such intervening acts." *Christie v. Lowrey*, 589 S.W.2d 870, 873 (Tex. Civ. App.—Dallas 1979, no writ). Allowing the vacation of a receivership at any time after its creation would work undue hardship on third parties who have dealt in good faith with the receiver. Furthermore, an unlimited time to appeal would mean that the order of receivership would never be beyond challenge, and thus never attain the finality upon which the parties, the receiver, and those who have transacted with the receiver, are entitled to depend.

*Sclafani*, 870 S.W.2d at 611.

44

This Court has also held that the failure to file an appeal from the order establishing a receivership within twenty days requires dismissal of complaints that "test the validity" of the receivership itself. *See Benningfield v. Benningfield*, 155 S.W.2d 827, 827 (Tex. Civ. App.—Austin 1941, no writ). In *Benningfield*, the original receiver did not qualify, and a subsequent order was entered appointing a different receiver with the same powers and duties. *Id*. This Court dismissed the appeal because the appeal bond was filed twenty-two days after the original order appointing the receiver. *Id*. at 828.

Given the nature of a receivership, a party's ability to seek termination or modification, and the policy reasons behind the twenty-day time limit to appeal, we conclude that the Fortenberrys were required to appeal the appointment of the receiver within twenty days from the October 27, 2006, order.[14] We, therefore, conclude that we lack jurisdiction to address the district court's initial appointment of Harper as the receiver.[15]

Further, even if we were to conclude that this Court has jurisdiction to consider the receiver's appointment, we would conclude that the district court did not abuse its discretion when it appointed a receiver for the company. *See Abella*, 945 S.W.2d at 849. It was undisputed that the shareholders were deadlocked in their voting power. At the time of the trial in October 2006, the minutes reflect that the shareholders' last election of directors was in 2002. The district court, therefore, could have appointed the receiver pursuant to article 7.05(A)(1)(e) because the

---

[14] In this case, Harper has been the receiver for Fortune Products for approximately two years.

[15] At oral argument, the Fortenberrys' attorney acknowledged that there were no substantive changes to the receivership in the final judgment.

shareholders were deadlocked and they had failed to elect successors for over two years at the time of trial. *See* Tex. Bus. Corp. Act Ann. art. 7.05(A)(1)(e).[16]

Relying on this Court's earlier opinion reversing the receivership, the Fortenberrys contend that the law of the case precluded the district court from appointing a receiver because, to support the appointment of a receiver under article 7.05(A)(1), the district court also had to find that "all other remedies available either at law or in equity" are inadequate. *See id.* art. 7.05(A). They argue that, as was the case when the interlocutory appeal was before this Court, there remains "no evidence of imminent danger of insolvency or other emergency justifying the appointment of a receiver." *See Fortenberry*, 2005 Tex. App. LEXIS 4665, at *10. "The 'law of the case doctrine' is defined as that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent stages." *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986).

The law of the case doctrine is inapplicable. When the interlocutory appeal was before this Court, this Court held that the district court "abused its discretion in prematurely ordering the appointment of a receiver with sweeping powers." *See Fortenberry*, 2005 Tex. App. LEXIS 4665, at *10. At that time, this Court found the appointment premature as there was the possibility that the resolution of the parties' declaratory actions and monetary and injunctive relief would be adequate remedies; this Court did not reach the "specific instances in which a receiver may be

---

[16] The district court, alternatively, could have found that a receiver should be appointed pursuant to article 7.05(A)(1)(b) based on the directors' deadlock and the shareholders' inability to break the deadlock or pursuant to section 64.001 of the civil practice and remedies code. *See* Tex. Bus. Corp. Act Ann. art. 7.05(A)(1)(b) (West 2003); Tex. Civ. Prac. & Rem. Code § 64.001(a)(3), (6) (West 2008). Because we conclude that the district court did not abuse its discretion in appointing a receiver pursuant to article 7.05(A)(1)(e), we need not address these additional grounds.

appointed," concluding that the Cavanaughs failed to demonstrate that other available remedies were inadequate at that time. *Id*. at *8, 10. At this juncture, the district court's declarations do not resolve the deadlocks between the shareholders or the directors and, based on Fortenberry's actions during the pendency of this case, the district court could have found that monetary and injunctive relief would be inadequate. This Court's prior ruling did not preclude the district court from appointing a receiver at some point in the future.

### *Contempt*

In their fifth issue, the Fortenberrys contend that the contempt order is "void as it exceeds the $500 maximum monetary penalty for contempt as set forth in section 21.002" of the government code. *See* Tex. Gov't Code Ann. § 21.002(b) (West 2004).[17]

As a preliminary matter, the Cavanaughs contend that this Court lacks jurisdiction to consider the contempt order because contempt orders are not directly appealable. *See Ex parte Williams*, 690 S.W.2d 243, 243 n.1 (Tex. 1985) (decisions in contempt proceedings "can be attacked only collaterally"); *Metzger v. Sebek*, 892 S.W.2d 20, 54-55 (Tex. App.—Houston [1st Dist.] 1994, no writ) (appeal from contempt proceeding dismissed); *Kidd v. Lance*, 794 S.W.2d 586, 587 n.1 (Tex. App.—Austin 1990, orig. proceeding) (mandamus is the "only" available remedy to contempt order where there is no order of confinement). The Fortenberrys respond that, because there is a final judgment, there is no need to pursue the matter by writ of mandamus and that the filing of a writ of mandamus is not a prerequisite to presenting the issue in an ordinary appeal.

---

[17] Section 21.002(b) of the government code provides that "[t]he punishment for contempt of a court other than a justice court or municipal court is a fine of not more than $500 or confinement in the county jail for not more than six months, or both such a fine and confinement in jail." Tex. Gov't Code Ann. § 21.002(b) (West 2004).

We find the reasoning in *Galtex Property Investors, Inc. v. City of Galveston*, 113 S.W.3d 922 (Tex. App.—Houston [14th Dist.] 2003, no pet.), instructive. In that case, our sister court considered the appellants' challenge to the contempt judgment on direct appeal, agreeing with the appellants' argument that the "contempt judgment was not truly a contempt proceeding" and should be recharacterized, to conclude that the "'judgment of contempt' was improperly denominated as a contempt order." *Id*. at 926-27. The court found that "[t]he order was actually a partial money judgment for civil penalties delineated in the agreed order." *Id*. at 927. In reaching its ruling, the court noted that "[d]ecisions in contempt proceedings may not be reviewed by an appellate court, even where a party seeks to appeal the contempt order along with a judgment that is appealable." *Id*. The Fortenberrys have not argued that the contempt order was "improperly denominated" a contempt order. *See id*.[18] We conclude that this Court lacks jurisdiction to review the district court's contempt order in this appeal.[19]

---

[18] On appeal, at oral argument and in their post-submission briefing, the Fortenberrys argued that the district court erred in ordering the penalty be paid to private parties. *See Galtex Prop. Investors, Inc. v. City of Galveston*, 113 S.W.3d 922, 928 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("The law is well established in Texas that a court may not award a civil judgment to a private litigant in a contempt proceeding."). The Fortenberrys have not preserved this argument for our review. *See* Tex. R. App. P. 38.1, 38.3; *Dallas Co. v. Gonzales*, 183 S.W.3d 94, 104 (Tex. App.—Dallas 2006, pet. denied) (rules of appellate procedure do not allow an appellant to raise new issue in reply brief); *Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 439 (Tex. App.—Austin 2004, pet. denied) (same).

[19] To the extent the Fortenberrys raise new issues in their reply brief, they have not preserved these issues for this Court's review. *See* Tex. R. App. P. 38.1, 38.3; *Howell*, 143 S.W.3d at 439. The Fortenberrys complain that the trial court erred in granting permanent injunctive relief in the final judgment and that Harper personally does not meet statutory qualifications to serve as a receiver.

**CONCLUSION**

Because we conclude that this Court lacks jurisdiction to consider the contempt order or Harper's initial appointment as the receiver for the company, we dismiss those portions of the Fortenberrys' appeal that seek review of the contempt order and receivership for lack of jurisdiction. Because we conclude that the district court did not abuse its discretion in awarding attorney's fees and costs in the amount of $747,037.84 to the Cavanaughs, that any errors in the district court's questions and instructions to the jury were either waived or did not cause the rendition of an improper verdict, and that the evidence was legally and factually sufficient to support the district court's declarations, we overrule the Fortenberrys' remaining issues and affirm the district court's judgment.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed in Part; Dismissed in Part

Filed:   November 26, 2008

49